1                    UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3             HONORABLE OTIS D. WRIGHT, II, U.S. DISTRICT JUDGE

4

5

UNITED STATES OF AMERICA,        )
6                                 )
              Plaintiff,          )
7                                 )
                   vs.            )
8                                 )   16-CR-401-ODW
     JULIO GOMEZ,                 )
9                                 )
              Defendant.          )
10   _____ )
                                  )
11                                )
                                  )
12

13

14

15

16                    PARTIAL TRANSCRIPT - JURY TRIAL

17                      Los Angeles, California

18                     Wednesday April 3, 2019

19

20

21          _____

                   AMY DIAZ, RPR, CRR, FCRR
22                  Federal Official Reporter
                   350 West 1st Street, #4455
23                   Los Angeles, CA 90012

24

25      *Please order court transcripts here:  www.amydiazfedreporter.com*

                AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
 1          APPEARANCES OF COUNSEL:

 2
            For the Plaintiff:
 3
 4                          United States Attorney
                            By:  SEAN PETERSON
 5                               SONAH LEE
                                 Assistant United States Attorneys
 6                          United States Courthouse
                            312 North Spring Street
 7                          Los Angeles, California 90012

 8
 9          For the Defendant:

10                          By:  DAVID KALYOYANIDES, Attorney at Law
                                 David Kaloyanides APLC
11                          14726 Ramona Avenue Suite 108
                            Chino, California 91710
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    THE CLERK:  Calling item one, CR-16-401, United
 2      States of America vs. Julio Cesar Gomez.
 3                    Counsel, may I have your appearances, please.
 4                    MR. PETERSON: Sean Peterson and Sonah Lee on behalf
 5      of the United States, and we are joined at counsel's table by
 6      Ryan Monis.
 7                    THE COURT:  Good morning.
 8                    MR. KALOYANIDES: David Kaloyanides for Mr. Gomez,
 9      who is present before the Court.
10                    THE COURT:  Gentlemen, good morning.  And we have
11      been joined by the jury.  Just a point of information, if
12      anyone lives over 70 miles away, let Ms. English know, we can
13      make hotel reservations.
14                    Point two, there is traffic in Los Angeles.
15                    All right.  We are going to begin the next phase of
16      the trial, which like I said last night is the opening
17      statements of counsel.  This is not evidence, but counsel's
18      view, what they portend the evidence will show.
19                    We begin with the government, who bears the burden
20      of proof.
21                    Ms. Lee?
22                    MS. LEE: Thank you, Your Honor.
23                    Ms. English, could that be converted, turned on to
24      the laptop here?
25                    Thank you, ladies and gentlemen.  Good morning,
```

```
 1      ladies and gentlemen.  My name is Sonah Lee.  I'm an

 2      Assistant United States Attorney, and I'm one of two

 3      attorneys representing the United States in this trial.

 4              I just want to give you a brief overview of this

 5      case.  This case, as you may have picked up by now, is about

 6      guns and drugs.  Specifically, it's about three quarters of

 7      methamphetamine and a rifle with an obliterated serial number

 8      that defendant sold on two occasions, first, on January 14,

 9      2016, and second, on February 17, 2016.  But he didn't sell

10      methamphetamine and a firearm with an obliterated serial

11      number just to anybody, he happened to sell them to an ATF

12      confidential informant.

13              On January 14, 2016, Defendant Gomez, along with a

14      coconspirator, sold a quarter pound of methamphetamine to an

15      ATF confidential informant.  About a month later, on

16      February 17th, 2016, he alone sold a half pound of

17      methamphetamine and a rifle to the same confidential

18      informant.  Now, the confidential informant is not law

19      enforcement, he's somebody who works with law enforcement and

20      he's paid for his part in doing so, and you are going to hear

21      from him.

22              The ATF confidential informant was wearing a body

23      recording device on him that recorded both the undercover

24      operation that happened on January 14th and on February 17th,

25      while law enforcement who worked with the confidential
```

1    informant supervised the undercover operations nearby.

2         During this trial, you are going to see defendant in

3    these recordings, and you are going to hear him in his own

4    words making arrangements selling and negotiating for the

5    sale of more methamphetamine in the future to this ATF

6    confidential informant.  While later on June 16, 2016, when

7    defendant was arrested by law enforcement in connection with

8    selling the methamphetamine and the firearm to ATF, he was

9    arrested in his girlfriend's bedroom in the morning of

10   June 16th, well, right next to the bed where he was sleeping,

11   law enforcement also found another gun, a pistol hidden in a

12   bag.  Right next to it was another bag with 4 grams of

13   methamphetamine.  And nearby was also a -- they also found a

14   box with 38 rounds of .40 caliber ammunition.  And on top of

15   the dresser nearby the bed they also found two loose rounds

16   of ammunition.  And on top of the closet they also found

17   magazine clips of ammunition.

18        For all his conduct, he has been charged with, one,

19   conspiracy to distribute methamphetamine and possession with

20   intent to distribute methamphetamine, and for actually

21   distributing methamphetamine on January 14, 2016.

22        For the February incident, he has been charged with

23   one count of distribution of methamphetamine and for being a

24   felon in possession of methamphetamine.  And for June 16th's

25   arrest, he has been charged with possession with intent to

1    distribute methamphetamine being a felon in possession of a

2    firearm, and for possession of a firearm in furtherance of

3    drug trafficking.

4         During this trial, it will be your job to evaluate

5    all the evidence that the government will present to you, and

6    to decide whether he did knowingly conspire with others to

7    distribute methamphetamine, whether he did indeed distribute

8    methamphetamine on January 14th and on February 17th, and

9    whether he was a felon in possession of a firearm on

10   February 17th and on June 16th, and whether he possessed with

11   intent to distribute methamphetamine on June 16th, the day he

12   was arrested, and whether he also possessed a firearm in

13   furtherance of a drug trafficking crime.

14        And to help you decide that, we are going to present

15   to you witness testimony, photographs, recordings that

16   captures defendant, the defendant in these recordings, and

17   him making arrangements, in his own words, to making

18   arrangements, negotiating prices, and offering to sell more

19   methamphetamine and firearms.

20        At the end of this trial, we'll have a chance to

21   come back to you and talk to you about this case again.  And

22   at that time, we are going to ask you to return the only

23   verdict that is supported by the evidence in this case, which

24   is a guilty verdict on all counts.

25        Thank you.

MONIS - DIRECT

1          THE COURT:  Thank you, Ms. Lee.  If you wish?

2          MR. KALOYANIDES: I will reserve, Your Honor.

3          THE COURT:  Thank you.  All right.  Ladies and

4    gentlemen, the defense is going to exercise its option of

5    reserving making its opening statement until the beginning of

6    its case in chief.  So we will go right into the plaintiff's

7    case in chief.

8          Your first witness?

9          MR. PETERSON: Your Honor, the United States calls

10   Ryan Monis.

11   THEREUPON:

12                          RYAN MONIS,

13   Called in these proceedings and after having been first duly

14   sworn testifies as follows:

15          THE CLERK:  Please be seated.  Please state your

16   first and last name and spell it, and speak slowly for the

17   record.

18          THE WITNESS:  Ryan, R-Y-A-N, Monis, M-O-N-I-S.

19          THE CLERK:  Thank you.

20          THE COURT:  All right, Mr. Peterson.

21          MR. PETERSON: Thank you, Your Honor.

22                       DIRECT EXAMINATION

23   BY MR. PETERSON:

24    Q. Good morning, Mr. Monis.

25    A. Good morning.

MONIS - DIRECT

1    Q. Mr. Monis, where do you work?

2    A. I'm a senior investigator with the Riverside County

3    District Attorney's Office.

4    Q. And for people unfamiliar with that title, could you

5    describe your role?

6    A. That role is that I'm assigned to a major organized crime

7    division within the District Attorney's office, and I am

8    cross sworn with the Federal Bureau of Investigations to

9    participate in a multi-agency task force, which investigates

10   organized crime within Riverside County.

11   Q. And previously, have you worked with other federal

12   investigatory agencies, as well?

13   A. Yes.

14   Q. And among those agencies was the Bureau of Alcohol,

15   Tobacco, Firearms and Explosives included?

16   A. Yes.

17   Q. May I refer to that agency as ATF from this point

18   forward?

19   A. Yes.

20   Q. What did you do before you became an investigator with

21   the Riverside County District Attorney's Office?

22   A. Well, I have approximately 26, 27 years of law

23   enforcement experience.  I started up in Northern California,

24   spent a few years up there.  In 1997, went to the Desert Hot

25   Springs Police Department as a canine handler.  While I was

MONIS - DIRECT

1    there, from 1997 to 2002, as I said, I was a canine handler.

2    I was a detective within the department and I worked

3    undercover narcotics with a multi-agency squad known as the

4    Coachella Valley Narcotics Task Force.  I left in 2002 to the

5    Riverside County Sheriff's Department.

6           While I was at the Riverside County Sheriff's

7    Department, I was a training officer for the department.  I

8    was assigned to a multi-agency gang task force, which was

9    overseen by the Department of Justice, along with ATF's

10   involvement, FBI's involvement.  I did that for approximately

11   three years.

12          I was promoted to detective within the sheriff's

13   department.  Continued to remain within the gang-related

14   investigations through the jail system.

15          And in 2000 -- October of 2006, I left and went to

16   the Riverside County District Attorney's Office, to where I

17   am today, and I'm currently what's known as a title of a

18   Senior 3, which is a lead investigator within the agency.

19    Q. Now, have you had special training relating to

20   investigations of narcotics activity?

21    A. Yes.

22    Q. And what has that training entailed, generally speaking?

23    A. Both through my assignments that, some of them which I

24   mentioned already, and schooling that I have received as a

25   result of being assigned to those particular assignments,

MONIS - DIRECT

1    when I was working undercover narcotics, I was a part of the

2    California Narcotics Officer's Association, and it's

3    basically an association of narcotic officers from all over

4    the State of California that participate in different type of

5    training scenarios to keep investigators up to date with

6    current case law and other investigative techniques that we

7    use to investigate narcotics-related activities.

8         Gangs and drugs kind of interact with each other, so

9    as a gang investigator, my narcotics experience has continued

10   in the same direction, but it has more of an overtone with

11   the gang culture, and how the gang members on the streets and

12   within the prison system operate in distributing and making

13   profit from narcotics.

14   Q. I would like to transition now.  Are you familiar with a

15   person named Julio Cesar Gomez?

16   A. I am.

17   Q. Are you also familiar if he uses a moniker or nickname?

18   A. I know him as Spanky.

19   Q. Do you see him here in the courtroom today?

20   A. I do.

21   Q. Could you identify him, either by an item of clothing or

22   by his location?

23   A. Black or dark blue suit, shaved head, sitting next to

24   counsel.

25             MR. PETERSON: Your Honor, may the record reflect the

MONIS - DIRECT

1    witness has identified the defendant?

2              THE COURT:  It does.  Thank you.

3    Q. And Investigator Monis, you have seen Mr. Gomez before

4    court today; is that correct?

5    A. Yes.

6    Q. Were you involved in an investigation of Defendant Gomez

7    in late 2015 and the first part of 2016?

8    A. Yes.

9    Q. And at that time you were working with the Riverside

10   County District Attorney's Office; is that right?

11   A. Yes.

12   Q. And was there another law enforcement agency that was

13   largely involved in the investigation?

14   A. ATF.

15   Q. Would you describe yourself as one of the case agents

16   involved in the investigation?

17   A. I was a co-case agent, along with ATF Agent Jesse

18   Woolley.

19   Q. For people unfamiliar with the phrase "co-case agent" or

20   "case agent" at all, how would you describe that term in this

21   context?

22   A. A case agent is commonly the person that oversees the

23   investigation.  It's like the go-to person, makes kind of the

24   decisions on the direction that that investigation may or may

25   not go.

MONIS - DIRECT

1    Q. And then at some point in time did Jesse Woolley leave
2    the Southern California area?
3    A. After the completion of the investigation, he moved to a
4    different division within the United States.
5    Q. And at some point in time did another individual from ATF
6    also become involved as a co-case agent in the investigation?
7    A. Paul Day.
8    Q. Yes.  Now, transitioning again, how did the investigation
9    into Defendant Gomez begin?
10    A. Well, in my task force, as I mentioned, we -- we
11    investigate major organized crime.  And when I say "major
12    organized crime," what I specifically mean is we focus on
13    gang members within the prison and the street-level-type of
14    environment.  And we focus on the worst of the worst.  So my
15    task force is not a street-level-type of task force, we are
16    what is considered a major task force; and therefore, we try
17    to focus our investigation on individuals that we believe is
18    the most dangerous to the -- not only the street-level-type
19    activity, but also the prison-level-type activity.
20    Q. How did Defendant Gomez come to your attention as an
21    investigator?
22    A. Well, I worked off and on with state parole agent Manny
23    Ortiz over the years.  He has been a part of some of my past
24    task forces.  He had mentioned to me, and exactly at what
25    timeframe I can't remember, about an individual that he

MONIS - DIRECT

1    was --

2              MR. KALOYANIDES: Objection, hearsay.

3              THE COURT:  Sustained.  Actually, overruled.

4              THE WITNESS:  So he had mentioned to me about an

5    individual that he was supervising on his GPS monitoring

6    system, high-level risk individual by the name of Julio

7    Gomez.  I didn't know who that was.

8              At first, nothing really did occur.  As we moved

9    forward with an informant that was working with us on a

10   project in Desert Hot Springs, a conversation came up about

11   this same particular individual through our informant; and

12   therefore, we had asked the informant to see if he could set

13   up an initial meeting to meet this individual to see if there

14   was anything potential investigative-wise that we could look

15   into.

16    Q. So I believe you just referenced one confidential

17   informant that you had been working with.  And who is that

18   confidential informant?

19    A. CI-5.

20    Q. And did he also go by another name, as well?

21    A. Anderzel Lopez, a/k/a Stranger.

22    Q. Sometimes is he referred to as Andy?

23    A. Or Andy, yes.

24    Q. Now, was that the only confidential informant that you

25   worked with in relation to the investigation of Defendant

MONIS - DIRECT

1    Gomez?

2     A. No.

3     Q. Who were the other ones?

4     A. The other informant is known as CI-489, which is a

5    monetary, paid informant that was working primarily for the

6    ATF.

7     Q. And did CI-489 go by the name of Gabe?

8     A. Yes.

9     Q. And was there a third confidential informant who had

10    peripheral involvement in the investigation?

11    A. Yes.

12    Q. And who was that?

13    A. CI-6, that is Andy or Anderzel Lopez's wife, Jasmine

14    Lopez.

15    Q. Now, why did you think that CI-5 might be of some

16    assistance in the investigation of Defendant Gomez?

17    A. Because in early 2015, as part of my -- my assignment, I

18    actually investigated Anderzel Lopez.  He was a part of a

19    state wire investigation where he was a target subject.

20         As a result of that criminal investigation, he was

21    arrested.  And during that interaction with him, questioning,

22    and what have you, we learned that he had information that we

23    believed could assist us on other investigations, which were,

24    in our opinion, larger than the investigation that we

25    investigated against him.

MONIS - DIRECT

1    Q. And to the extent that you didn't describe it already,

2    what was the conduct that you were investigating in regards

3    to CI-5?

4    A. CI-5 had affiliation with a criminal street gang known as

5    North Side Indio, and he also had direct affiliation with the

6    Mexican Mafia.  And he was into distribution and furnishing

7    of methamphetamine throughout the Coachella Valley, along

8    with our belief that he had access to various firearms.

9    Q. Now, why did you think that CI-5 would be of assistance

10   in investigating Mr. -- or Defendant Gomez specifically? Was

11   there a relationship between the two?

12   A. Not -- no relationship between the two, other than both

13   being from the same criminal street gang of North Side Indio,

14   and the fact that both had affiliation with the Mexican

15   Mafia.  And in the --

16       MR. KALOYANIDES: Objection, lacks foundation, move

17   to strike.

18       THE COURT:  All right.  Lay the foundation for his

19   knowledge.

20   Q. Investigator Monis, how did you develop information

21   regarding, I would like to start with CI-5?

22   A. Okay.

23   Q. How did you develop information regarding CI-5's

24   affiliation with the Mexican Mafia?

25   A. He admitted it to me.  And he admitted his affiliation

MONIS - DIRECT

1    with North Side Indio.  He basically said -- he explained his

2    role in and out of the prison system, how he operated, and

3    the direct fact that I did a criminal investigation where we

4    were monitoring his phone lines and listening to phone calls.

5    We knew that he was directly having communication with other

6    gang members and associates of the Mexican Mafia.

7    Q. So I would like to transition now and ask with regards to

8    Defendant Gomez, how did you learn that Defendant Gomez had

9    affiliations with the Mexican Mafia?

10   A. Directly at that point, the -- what led me to believe

11   that he definitely was a street criminal gang member was his

12   tattoos that he had on his person that I reviewed.  And then

13   also in reviewing his files, per se, his past arrest files,

14   his prison files, and those interactions, along with

15   information that was provided to us from Manny Ortiz, we

16   believed that he did have some, at least at the beginning

17   stages, some affiliation.

18              MR. KALOYANIDES: Objection, lacks foundation.

19              THE COURT:  Overruled.

20              MR. KALOYANIDES: Move to strike.

21              THE COURT:  Overruled.

22   Q. And so it's your understanding that CI-5 was in a

23   position to communicate with and associate with Defendant

24   Gomez; is that correct?

25   A. He was in a unique position because of his environment

MONIS - DIRECT

1    that he lived in, which I obviously don't live in that

2    environment, nor do many of us.  So he has an opportunity

3    that we don't have.  And we wanted to utilize that

4    opportunity to see if there was some type of illegal activity

5    that was being perpetrated by Mr. Gomez.

6     Q. Would you have used somebody who did not have some kind

7    of criminal past of his or her own to further the

8    investigation?

9     A. Can you repeat that, please?

10     Q. Would you have used a person as a confidential informant

11    in the investigation who did not have some kind of criminal

12    conduct in their past?

13     A. Well, it's not necessarily the fact that they have the

14    criminal conduct in their past, it's more of you've got to

15    look at the environment that that individual can penetrate,

16    if that is the right word.  Because we are -- they are in an

17    environment where they can obtain that information without

18    being suspected of being law enforcement or working for law

19    enforcement.  Therefore, they don't necessarily have to have

20    a criminal background, but I think that is kind of like

21    street cred for them to have criminal background to interact

22    with those type of people.

23     Q. You said "street cred," as in street credit; is that

24    right?

25     A. Yes.

MONIS - DIRECT

1    Q. And also focusing on CI-5 for the moment, are you aware

2    if he had any history of drug use?

3    A. He did.

4    Q. Now, what role does CI-5 play in the investigation

5    vis-a-vis CI-489?

6    A. CI-5's role was to basically open up that door, so CI-489

7    could actually move forward as a purchaser of

8    methamphetamine, firearms, or obtain any type of other

9    evidence that we deemed -- that we wanted to move forward

10   with.

11   Q. So he was essentially introducing CI-489 to Defendant

12   Gomez and other individuals who were under investigation; is

13   that right?

14   A. That is correct.

15   Q. Now, did you have any particular role with regards to

16   CI-5, such as as a handler?

17   A. Yes, I was his -- I was one of his handlers, yes.

18   Q. For people unfamiliar with that term or phrase, what does

19   that mean in context to you?

20   A. Handler is a, I guess you want to call it a slang term

21   that has kind of developed over the years, but basically

22   myself as the law enforcement officer, I'm kind of the one

23   that handles him, you know, like basically obtains the

24   information with him, communicates oftentimes with him about

25   stuff that is going on on the streets.  Helps when -- if that

MONIS - DIRECT

1    individual is on a consideration contract, I'm kind of the

2    one that is the go between between the DA and him to make

3    sure if there is any court appearances, that that is

4    accomplished, and to report back to the DA if there is any

5    mishaps.  So the DA that is overseeing it on their end is

6    completely aware how to move forward with that individual if

7    something should happen.

8    Q. So what is your understanding of the agreement that

9    existed between CI-5 and the Riverside County District

10   Attorney's Office in regards to the role he would play as a

11   confidential informant, in general terms?

12   A. In general terms, when he was signed up initially, it was

13   because of the pending case that we had developed against him

14   for the state wire investigation that I mentioned earlier.

15   He was put on a contract and basically was asked to provide

16   information that not only led to arrests, but also led to

17   successful filings for prosecution on so many different type

18   of cases.  His job was basically to help gather evidence,

19   provide information, and also introduce either undercover

20   agents and/or informants to potential targets to successfully

21   collect evidence related to whatever investigation we may do.

22   He was basically told that this, you are getting a suspended

23   sentence of so many years in prison, and you will stay out of

24   jail.  As long as you don't violate any additional criminal

25   laws and you follow the rules of the contract, and as long as

MONIS - DIRECT

1    he was satisfying the district attorney that oversaw that

2    project, then he would be able to remain out of custody and

3    assist us until the completion of that contract.

4    Q. That was your general understanding, right?

5    A. Yes.

6    Q. Now, how was CI-5 supposed to work?  For example, was he

7    supposed to call you up every time he had an interaction with

8    a potential suspect, or how did that aspect of his role as a

9    CI work?

10   A. We -- we didn't -- I didn't want him to call me every

11   single time he talked to a bad guy, because otherwise my

12   phone would have never stopped ringing.  But he did have some

13   parameters in the sense of, you know, here is the subjects

14   that we are focusing on, here is the subjects that we would

15   like to see.

16         If they are conducting some type of illegal

17   activity, if you obtain information or have some type of

18   interaction that we can work with, he was to contact either

19   myself or Agent Woolley.  And we would, you know, kind of go

20   over the information, either corroborate it or figure out

21   that it's not viable, and we would make a determination based

22   on that initial information if we wanted to move forward.

23         If we did, then we would basically give him some

24   direct instructions on what we wanted done next, and we would

25   try to move forward with the criminal investigation, whatever

MONIS - DIRECT

1    it may be.

2     Q. So there would have been times that CI-5 would

3    potentially have met with a suspect of an investigation

4    outside of your presence; is that right?

5     A. Outside of my presence.  And he may have never have

6    called me to tell me that he had that one-on-one contact or

7    contacts with multiple people.

8     Q. Now, did the agents who worked with you on the

9    investigation of Defendant Gomez take any precautions with

10   regards to using CI-5 as a confidential informant --

11    A. Yes, we did.

12    Q. -- in the investigation?

13         Generally speaking, what were those precautions?

14    A. In all honesty, CI-5 was probably, if not to this day has

15   been one of my most high risk informants that I've used.  And

16   what I mean by that is I wasn't worried about him being

17   dangerous, I was worried about maintaining the integrity of

18   the investigation.

19         And as a result of that -- as a result of that fear,

20   myself and Agent Woolley, along with ATF, we basically

21   decided that the best way to move forward is utilize CI-5 as

22   more of the informational only-type individual, the one that

23   would be setting up the meetings to introduce the other

24   CI-489, and allow CI-489 or another informant that we

25   approved of to actually physically handle the drugs and the

MONIS - DIRECT

1      guns that we were attempting to purchase, not just from

2      Mr. Gomez, but from other individuals that we were

3      investigating.

4       Q. Now, so basically you described a role that CI-489 was to

5      play in the investigation; is that right?

6       A. Yes.  I wanted him to remain as comfortable as possible,

7      but maintain the role that we knew he could maintain as to

8      the bad guys, still appearing himself to be a bad guy.  So he

9      could basically, when he says he wants to do an introduction

10     of somebody completely new into the fray, the target is not,

11     Oh, no, no, no, you are not bringing him around, because he

12     has trust, they trust him, and he's allowed to bring

13     individuals in that have never been seen before.  And then

14     within a few days, if not a week, we have deals for drugs and

15     guns set up that we can move forward with.

16      Q. Did you also utilize a recording device or devices during

17     the meetings that were conducted with Defendant Gomez?

18      A. Yes.

19      Q. And the confidential informants were equipped with those

20     recording devices?

21      A. Yes.

22      Q. Did one of those recording devices also work as a

23     transmitter that would actually send out an audio signal?

24      A. Yes.

25      Q. And you or one of your colleagues in the investigation

MONIS - DIRECT

1    would be able to receive and listen to the audio signal, to

2    the extent that it was transmitted successfully?

3    A. Yeah, but we did -- but full disclosure is that it was

4    very -- sometimes it was very hard to hear because it's

5    basically a hand-held radio, and you are trying to receive a

6    radio wave from a couple of blocks away and hear what is

7    being said.  Sometimes you get very good audio and sometimes

8    you get broken audio.  So I never will say that I could hear

9    from start to finish a conversation utilizing that device.

10   Q. You would hear snippets?

11   A. Yes.

12   Q. Now, did you and other investigators also use a GPS

13   tracking device in the vehicle or vehicles that the

14   confidential informants, including CI-5, would use during the

15   course of planned operations in the investigation?

16   A. Correct.  If we had a planned operation where we were

17   going to have a, what is known as a physical surveillance

18   going on, where we actually have additional agents doing a

19   live monitoring, along with the GPS tracker, we have a device

20   that we basically just put into the vehicle of the -- of the

21   friendly's car, and we basically have the ability to pull a

22   signal up on our phones or laptops and do a live tracking, so

23   we know exactly where that vehicle is at.

24       And that is done for two reasons:  One is so it

25   makes it easier for us to do surveillance so we don't have to

MONIS - DIRECT

1     be right on top and get burned.

2            And number two, if there is a rescue situation

3     because something should happen during that meeting, we know

4     exactly where to go because we have a GPS tracker that is

5     giving us a live signal to say that is where they are at, go

6     to that location, and there is no -- not everybody is

7     understanding where to go to basically do what is called a

8     hostage rescue.

9     Q. And was it your practice during the investigation of

10    Defendant Gomez to have a GPS tracker put in the confidential

11    informant's vehicle at the beginning of an operation and then

12    retrieve that at the end of the operation?

13    A. Yes.

14            MR. KALOYANIDES: Objection, leading.

15            THE COURT:  Overruled.

16    Q. Did it later come to your attention that CI-5 had a

17    different form of location monitoring associated with him?

18    A. Um, I later -- I later learned, but I kind of -- I didn't

19    really know, but I kind of learned, and it was kind of like,

20    I guess you want to call it an investigator's overlook error.

21    Anderzel, when he went on his probation regarding his

22    contract with us, he was put on an ankle monitoring system by

23    the Riverside County Sheriff's Department, or Probation

24    Department, I'm not sure who actually monitored it.  We did

25    not collect that data.  And that data was not available to us

MONIS - DIRECT

1    through the sheriff's department.  I don't have access to

2    that system.

3        The only thing that I could have done later on is,

4    at the completion of the investigation, is ask to obtain GPS

5    coordinates, and what have you, of where he would have been.

6        But for the purpose of our investigation, even if I

7    was aware that I could obtain that data, I never even thought

8    about obtaining that data, because, like I said, we always

9    put a GPS tracker.  We had live surveillance, so we --

10   during -- when I was physically present, I did know where he

11   was at.  Again, but when I wasn't there, obviously I didn't

12   know where he was at, but I was never in the fray to monitor

13   his activity even if I wanted to.

14    Q. And Investigator Monis, there is one phrase you used

15   earlier that I failed to follow up with you on.  I believe

16   you used the word "friendly" in describing confidential

17   informants.  Could you just put that word in context, please?

18    A. A friendly is somebody who works for law enforcement that

19   we call friendly, because they are assisting us.  So I

20   just -- it's just kind of a term that us investigators have

21   developed over the years, I guess a slang term.  So if you

22   hear me mention friendly, I'm simply just talking about the

23   cooperators, the informants that are assisting us, because

24   they are friendly to law enforcement.

25    Q. And earlier you mentioned that there was a third

MONIS - DIRECT

1    confidential informant, I believe you said CI-6, who had

2    peripheral involvement in the investigation.  Could you just

3    describe generally that informant's role?

4     A. Yes.  Because of my previous investigation against

5    Anderzel Lopez on the state side wire case in early 2015,

6    Anderzel would commonly conduct his criminal conduct, always

7    in the presence of his wife.  So when he would go out and

8    drive around and maybe do a drug deal or he was meeting with

9    people, his wife was always present.  So it is what it is.

10   Her involvement was very limited.

11        However, I did not want to change the environment

12   for Anderzel Lopez.  So when we put him on contract, we also

13   included her, because we wanted the environment to continue

14   to be the same, so people didn't start questioning, Hey, why

15   isn't your wife with you? She's always with you.

16        So we did that for the purposes of optics.  Her

17   information that she provided to us was very limited, because

18   again, she didn't actually participate in these high-level

19   drug deals.  She was always just sitting in the car, and what

20   have you, would provide us intel about countersurveillance,

21   per se, when we would do operations.

22    Q. I would like to turn now to what transpired in the

23   investigation of Defendant Gomez on or about January 7, 2016.

24    A. Okay.

25    Q. On or around that day, did you ask CI-5 to set up a

MONIS - DIRECT

1   meeting between CI-489, on the one hand, and Defendant Gomez

2   and another individual on the other hand?

3   A. Yes.

4   Q. And how did that transpire?

5   A. Well, basically, once we determined that there was a

6   possibility of moving forward on an investigative role in

7   regards to Cesar Gomez, we felt that introducing 489 through

8   Anderzel, CI-5, was the appropriate thing to do.  So we could

9   set up, if possible, future deals of trying to buy guns and

10  drugs.

11      So the instruction was is to have Anderzel

12  communicate with Gomez and any other individuals that Gomez

13  was working with on his end, and basically take CI-489 and

14  CI-5 together to a meeting at a restaurant of some location,

15  wherever they chose, and allow Anderzel to meet with the

16  individuals, with CI-489, and introduce CI-489 as his friend,

17  as his, you know, cohort, and basically allowing CI-489 to

18  then do his part in trying to set up future drug and gun

19  deals.

20  Q. So I understand you just described what was supposed to

21  happen in the context of the investigation.  Was there a

22  meeting that actually took place on January 7, 2016?

23  A. Yes, sir.

24  Q. And where did that meeting take place?

25  A. It was at a taqueria on Date Palm in Cathedral City.

MONIS - DIRECT

1    Q. And prior to -- I'm sorry.  That was a meeting between

2    CI-5, CI-489, Defendant Gomez and Angel Carmona, among other

3    people; is that correct?

4    A. Yes.  The only two people that we were able to identify

5    that night was Gomez and Carmona.  And I was familiar with

6    Carmona because he was a part of a state investigation that I

7    did at the same time I did Andy on the wire case.

8         The other two individuals we never were able to

9    identify, other than just being criminal street gang members.

10   Q. Now, I would like to take a step back.  Before the

11   meeting at the restaurant, was there a planning meeting that

12   took place between law enforcement investigators and the

13   confidential informants who were involved in the later

14   meeting that day?

15   A. Yes.  So what we did is we met at a location in the area.

16   We basically talked to them about, you know, the parameters

17   of what we wanted to hopefully see happen and what they were

18   allowed and not allowed to do.

19        Actually, under the anticipation that there could

20   have been a transaction for drugs or guns, CI-489 was

21   actually provided with money in case the opportunity came

22   about that he could buy some illegal contraband at that

23   point.  That did occur that night.

24        What ended up happening is after they were given

25   their body wires, their vehicles were checked for any

MONIS - DIRECT

1    contraband that may hinder the investigation, which there was

2    none.  We placed a GPS tracker in the car.  And then they

3    both together went in one car to the taqueria and waited

4    until Gomez and Carmona, along with two other individuals

5    that we did not identify, all arrive.

6         And they all went inside of the taqueria together,

7    and had about an hour-and-20-minute meeting maybe.  And then

8    at the end of it, we saw all of them walk out, depart, and we

9    talked to them about what had occurred and what was -- what

10   potentially was going to happen in the future.

11   Q. When the confidential informants traveled from the

12   pre-meeting location to the restaurant on Date Palm Drive in

13   Cathedral City, did you and other law enforcement essentially

14   follow them from the pre-meeting location to the restaurant?

15   A. Two things happened:  We knew where the meeting was going

16   to take place, so a surveillance team was already set up

17   within the complex to get good parking places and get what we

18   call eyeballs on the front door of the location, and to try

19   to coordinate where we wanted vehicles to park to try to get

20   the best visual advantage.

21        And then myself and Agent Woolley, and I believe

22   Investigator Sandoval, followed visually along with the GPS

23   tracker the CI-5 and CI-489 from the initial meet location to

24   the taqueria where we parked across the street, observed them

25   park.  And they basically waited at that location until, like

MONIS - DIRECT

1    I said, Gomez and Carmona and the two other individuals

2    showed up.

3     Q. Now, after the meeting at the taqueria on Date Palm Drive

4    and Cathedral City, did -- were you involved in monitoring

5    the confidential informants as they then traveled from that

6    restaurant to a second location?

7     A. Yes.

8     Q. And how did that play out?

9     A. Similar to the way that it started.  At the completion of

10   the meeting, the -- we saw Gomez and Carmona, along with some

11   other individuals exit.  We were able to identify, like I

12   said, Carmona and Gomez.  They got into a vehicle.  We

13   attempted to -- the surveillance team, not my team -- not

14   myself, but the surveillance team attempted to follow away to

15   see if they went anywhere close to the area.  You know, to

16   get some better type of identification, try to get better

17   vehicle description information.  We didn't want to burn it

18   because really nothing had happened at that point, so we were

19   very loose in doing that.

20        And then myself, Sandoval and Woolley followed CI-5

21   and 489 and eventually met with them, and then basically got

22   a debrief of what had occurred inside.  And then eventually

23   collected the recording devices that were used to obtain that

24   evidence and review those at a later time to see what, you

25   know, we could do.

MONIS - DIRECT

1    Q. And were you able to later confirm that the recording

2    device did, in fact, record -- make recordings of what

3    happened inside of the restaurant?

4    A. Yes.

5    Q. I would like to ask you to turn your attention now to

6    what has been marked for identification purposes only as

7    Government Exhibit 10.

8    A. Okay.

9    Q. Do you recognize that?

10   A. I do.

11   Q. What is that?

12   A. This is a still photo taken from one of the surveillance

13   devices that was utilized that night at the taqueria.  And

14   that is an image of Angel Carmona.

15        MR. PETERSON: Your Honor, the government moves to

16   publish and to move the exhibit into evidence.

17        MR. KALOYANIDES: No objection.

18        THE COURT:  Per our earlier discussion, you can

19   publish right away, just simply identify it for the record.

20        MR. PETERSON: Thank you, Your Honor.  I'll do that

21   going forward.

22        THE COURT:  Just use the document cam for now.

23        (Thereupon, Exhibit Number 10 was received in

24   evidence.)

25   Q. Okay.  Now, Agent Monis, I would like to ask you to turn

MONIS - DIRECT

1     your attention to what has been marked for identification

2     purposes only as Government Exhibit 11.  Now, I realize the

3     clarity of this picture is not ideal, especially on the

4     projector, but are you able to identify this exhibit?

5      A. Yes.  I'm familiar with it because I'm the one that

6     obtained it.  But it is of Mr. Gomez.  And I know the picture

7     itself on the Elmo is making it difficult to see, but that is

8     a picture of Mr. Gomez.

9             MR. KALOYANIDES: Objection, lacks foundation.

10            THE COURT:  How do you know that?

11            THE WITNESS:  Excuse me?

12            THE COURT:  How do you know that?

13            THE WITNESS:  I'm the one that obtained it, and I've

14     seen Gomez before, so I knew based on seeing Gomez and then

15     obtaining the photograph that night, and also CI-489 and --

16            THE COURT:  When you say you are the one who

17     obtained it, you took it?

18            THE WITNESS:  No.  So the camera -- what happened, I

19     captured the still photo from the video.  I should say, there

20     is a video, and then I'm the one that stopped the video at

21     that point, snapshotted it, and then which created the photo

22     itself that you are looking at now.

23            THE COURT:  Had you ever seen Mr. Gomez before?

24            THE WITNESS:  During surveillances and stuff, not

25     face to face.

MONIS - DIRECT

1          THE COURT:  All right.  Thank you.

2          Overruled.

3    Q. Okay.  Now, that meeting that we were just discussing and

4    where recording devices captured these two still photographs,

5    among other things, I believe you said that that happened on

6    or about January 7, 2016; is that correct?

7    A. Yes, sir.

8    Q. Was there a -- and at that meeting, is it your

9    understanding that the parties involved, that is to say

10   Defendant Gomez, Angel Carmona and CI-489, discussed a

11   subsequent meeting that would happen in approximately one

12   week later?

13   A. Yes.

14   Q. And did that meeting actually take place?

15   A. It did.

16   Q. What preparation did you and other law enforcement do

17   before that meeting?

18   A. Well again, we knew that we were going to have a future

19   interaction.  And this time we knew that there was going to

20   be the high potential of purchasing firearms and narcotics at

21   this next meeting; therefore, we did what is known as a game

22   plan.  Worked with the ATF's react team, and surmised an

23   operation plan to try to successfully purchase guns and drugs

24   from Angel Carmona and Mr. Gomez.  And also, there was

25   another individual that became involved by the name of Steven

MONIS - DIRECT

1    Gonzalez.

2     Q. And in reviewing the recordings from the January 7th

3    meeting, did you hear Mr. Gonzalez referenced by his moniker

4    in that recording?

5     A. Mr. --

6     Q. Mr. Gonzalez, the third individual that you referenced?

7     A. Talking about Cub?

8     Q. Yes.

9     A. Yes.

10    Q. You heard a reference to Cub or Cubs on that recording?

11    A. Yes.  I misunderstood your question, sorry.

12    Q. I'll stay closer to the lectern.

13         Now, in planning for that meeting, similar to what

14   happened on January 7th, was there a pre-meeting between

15   investigators involved in the investigation and the

16   confidential informants?

17    A. Yes.

18    Q. On that same day, January 14th, 2016?

19    A. Yeah, approximately 30, 45 minutes prior.

20    Q. And what happened at that meeting?

21    A. Well, all the investigators that were assigned to the

22   surveillance, along with the informants, arrived at an

23   undisclosed location.  We all met to obviously allow the

24   agents on surveillance to see not only what kind of vehicle

25   our informants were going to be in so they knew what to look

MONIS - DIRECT

1      for, also to see what they were wearing clothing-wise,

2      because again, if there is a situation known as a hostage

3      rescue, we wanted them to know who the good guys are and the

4      bad guys are kind of situation.

5              We searched the vehicle that was going to be

6      involved by the informants to ensure that there was no

7      illegal contraband or other type of means that would

8      compromise the integrity of the investigation.  I placed a

9      GPS tracking device in the vehicle that was being operated by

10     the informants.  And they were given instructions and money

11     to successfully complete the pending transaction.

12             And the money was actually given to CI-489.  CI-5

13     did not touch the money.  His only involvement was to

14     continue the relationship of introducing 489 to the group

15     that we were focusing the investigation on.

16      Q. And that day did CI-5 show you a text message exchange

17     that he had with Defendant Gomez?

18      A. Yes.

19      Q. Could you turn your attention now to what has been marked

20     for identification purposes only as Government Exhibit 15.

21      A. Okay.

22      Q. Do you recognize that?

23      A. Yes.

24      Q. What is that?

25      A. This is a snapshot of the text message chain between

MONIS - DIRECT

1    Gomez and CI-5.

2              MR. KALOYANIDES: Objection, lacks foundation.

3              THE COURT:  All right.  How do you know?

4              THE WITNESS:  The CI told us that is what it was.

5              THE COURT:  This is the CI's phone?

6              THE WITNESS:  Yeah, that is the CI's phone.  He

7    actually -- that is actually a photograph of his phone.

8              THE COURT:  All right.  Overruled.

9    Q. Now, where was the meeting to take place on January 14th,

10   2016?

11   A. At our address on Mountain View and North Indio.

12   Q. And was that address -- when you say "address," is that a

13   house or a residence?

14   A. Yes.

15   Q. And is that residence associated with any particular

16   person, in your experience?

17   A. Yes.

18   Q. And who is that?

19   A. Cubs.

20   Q. And did you mention earlier that Cubs is also known as

21   Steven Andrew Gonzalez?

22   A. That is correct.

23   Q. What -- what happened when the confidential informants

24   and law enforcement providing surveillance arrives at the

25   planned meeting location on Mountain View Avenue in Indio?

MONIS - DIRECT

1      A. Well, we -- at the time of the initial meet, we knew the

2      general area of where Cubs' grandparents was at.  The actual

3      physical address we had not obtained yet.  So through

4      surveillance and through the information provided by the

5      informants, we were able to later determine the address on

6      Mountain View.  We had vehicles in and around the area on

7      Mountain View that followed the CI-5 and 489 and 06 into the

8      Mountain View location.

9           And because of a lot of what we call street traffic,

10     foot traffic, we were afraid of people being

11     countersurveillance for law enforcement.  So we were very

12     careful about being too close to the area because we didn't

13     want to get burned.

14          So we did a lot of relying on the audio wire to hear

15     conversations that was taking place, and the GPS tracker that

16     was in the vehicle associated with.  And then CI-6 was also

17     providing phone call updates to us while we were on

18     surveillance telling us about what is going on.  She actually

19     told us, Don't drive up and down the street, there is some

20     people looking around.

21     Q. Was there any suspect of the investigation at the

22     location when the confidential informants arrived there?

23     A. When they first arrived, the only individual that they

24     made contact with was Steven Gonzalez.  They remained at that

25     location interacting with Steven Gonzalez for 15, 20 minutes

MONIS - DIRECT

1    maybe.

2            And then after that period of time, Gomez and

3    Carmona arrived together in a separate vehicle.  And they

4    transitioned themselves from the Mountain View location about

5    a block away to an address on Deglet Noor, where they went

6    inside and ultimately completed the deal.

7    Q. Now, for the record, did you say they, all parties, that

8    is to say the confidential informants on the one hand, and

9    then Defendant Gomez, Angel Carmona and Steven Gonzalez on

10   the other hand, moved from one location on Mountain View to a

11   location on a separate street on Deglet Noor; is that right?

12   A. That is correct.

13   Q. And is it your understanding Deglet Noor is spelled

14   D-E-G-L-E-T N-O-O-R?

15   A. That's correct.

16   Q. And then how did the parties move from the one location

17   to the other?

18   A. In their vehicles.

19   Q. So there were two vehicles that traveled from the one

20   residence to the second residence?

21   A. Yes.

22   Q. Approximately what time did the parties arrive at the

23   second residence on Deglet Noor?

24   A. Between 6:30 and 7, 6:45-ish.

25   Q. So in the evening or early night?

MONIS - DIRECT

1     A. It was dark.

2     Q. Then in summary terms, what happened inside of the

3     residence?

4     A. Once inside of the residence, they went into -- Carmona,

5     Gomez, CI-5 and CI-489 and Gonzalez eventually all entered a

6     room somewhere within that residence together.  And within a

7     short few minutes of them sitting down, Carmona had passed a

8     firearm to CI-489.

9            MR. KALOYANIDES: Objection, lacks foundation.

10            THE COURT:  Sustained.

11     Q. Prior -- I'm sorry.  I'll withdraw that word.

12            Did you at the end of the events on that day,

13     January 14th, did you collect recording devices from the

14     confidential informants who were involved in the -- in the

15     meetings that you were describing?

16     A. Yes.

17     Q. Did you review those recordings?

18     A. Yes.

19     Q. And did you also discuss with the confidential informants

20     what happened?

21     A. Yes.

22     Q. Now, I understand from your previous testimony that you

23     weren't actually inside of a residence or inside of a car

24     where some of the people you have described were located, but

25     you were also, you were in the area; is that correct?

MONIS - DIRECT

1      A. That's correct.

2      Q. And you and other law enforcement who have spoken with

3   you were observing the locations where the people you have

4   described were meeting; is that correct?

5      A. That's correct.

6      Q. And is your summary testimony today, in response to my

7   question as to what happened in the Deglet Noor residence,

8   based on these various points of evidence and information

9   that you have reviewed?

10      A. Yes.

11          MR. PETERSON: Your Honor, with that, I would ask him

12   in summary form what transpired within the residence.

13          MR. KALOYANIDES: Your Honor, I still think it lacks

14   foundation, but -- we might need to hear more testimony, but

15   right now it's lack of foundation.

16          THE COURT: I understand.  And let me just say this,

17   it's my understanding that CI-489 is going to testify in this

18   case?

19          MR. PETERSON: Yes, Your Honor.

20          THE COURT: And CI-489 was in the room at the time?

21          MR. PETERSON: Yes, Your Honor.

22          THE COURT: So -- and you've interviewed CI-489 and

23   you know what he knows?

24          MR. PETERSON: Your Honor, yes, and --

25          THE COURT: Your questions then are good faith

MONIS - DIRECT

1    questions based upon the information you have received in

2    your interview of CI-489?

3              MR. PETERSON: Yes, Your Honor.

4              THE COURT:  In the interest of time, I'm going to

5    permit this with the caveat that should CI-489's testimony

6    not bear out this gentleman's testimony, I'll have it

7    stricken from the record.

8              So go ahead.  You can answer.

9              MR. PETERSON: Your Honor, I -- I think I can just

10   jump ahead and --

11             THE COURT:  Okay.

12             MR. PETERSON: In my questioning, as well, but thank

13   you.  In the interests of efficiency.

14   BY MR. PETERSON:

15    Q. Were you and other law enforcement performing observation

16   or surveillance when the confidential informants exited the

17   Deglet Noor residence where the meeting took place between

18   the confidential informants on the one hand, that is to say

19   CI-5 and CI-489, and Defendant Gomez and Steven Gonzalez and

20   Angel Carmona on the other hand?

21    A. Yes.

22    Q. And what did they do after they exited the Deglet Noor

23   residence?

24    A. CI-5, 489 and CI-6 entered the vehicle that they arrived

25   in.  And from that point myself, Agent Woolley and Agent

MONIS - DIRECT

1    Sandoval, and I believe one other surveillance unit, exactly

2    who I don't remember who, but we followed them back to the

3    predetermined location that we indicated we wanted them to go

4    to.

5          And at that point they met with us and turned over

6    the collected evidence that they had obtained, along with us

7    collecting the GPS tracking device and the recordings.  And

8    then we checked the vehicle again that they arrived in to

9    make sure there wasn't some type of contraband inside that

10   would hinder the investigation or the integrity of the

11   investigation.

12         And then got a complete debriefing to -- or they

13   spoke to Agent Woolley and gave them a debriefing about what

14   occurred inside of the residence.  And then I overheard that

15   conversation.

16    Q. What -- apart from the recording devices and leftover buy

17   money, what other items did you and other law enforcement

18   officers who met with the confidential informants recover

19   from them on January 14th, following their exit from the

20   Deglet Noor residence?

21    A. Quarter pound of methamphetamine and a steel revolver.

22         MR. KALOYANIDES: Objection, lacks foundation as to

23   the methamphetamine.

24         MR. PETERSON: May I ask a question, Your Honor?

25         THE COURT:  The question was what items did you

MONIS - DIRECT

1      recover, correct?

2              THE WITNESS:  That's correct.

3              THE COURT:  Overruled.

4              MR. PETERSON: Your Honor, may I approach the witness

5      with items of physical evidence?

6              THE COURT:  Yes.  Go ahead.

7      Q. Investigator Monis, do you have two items in front of you

8      that have stickers associated with them identified as

9      Exhibits 31 and 32?

10     A. Yes.

11     Q. Do you recognize those items?

12     A. Yes.

13     Q. What are they?

14     A. Item 31 is the methamphetamine that was turned over to us

15     from CI-489, and item number 32 is the stainless steel

16     handgun revolver that was turned over to us by CI-489.

17     Q. Now, in describing item 31, you described it as

18     methamphetamine.  I would like to unpack that a little bit.

19     Is -- is the appearance of the -- so on the outside there is

20     plastic bags; is that right?

21     A. Yeah.  The outside is the evidence bag that we sent to

22     the DEA, inside are plastic baggies contained within.  I

23     can't honestly say that these were the same plastic baggies

24     that were turned over the night of the incident.  I don't

25     know if they did something at the lab or something that's

MONIS - DIRECT

1      unknown to me, so...

2       Q. On January 14th, do you recall recovering an item whose

3      the appearance of which was consistent with methamphetamine

4      in your appearance -- in your --

5       A. I do want to say that specifically, I saw the items being

6      turned over.  I didn't physically take custody of them, that

7      was Jesse Woolley.  So Jesse Woolley was actually the one

8      that physically collected the evidence.  So, but yes, I mean,

9      I was present when a baggy of a white, powdery substance

10     resembling methamphetamine was turned over.  And I do

11     recognize this firearm as being the firearm that was turned

12     over by CI-489.

13      Q. I would like to turn your attention now to what has been

14     marked for identification purposes only as Government

15     Exhibit 16.  Do you see that?

16      A. Yes, sir.

17      Q. And do you recognize that?

18      A. Yes.

19      Q. What is it?

20      A. That is the baggy that was of the suspected

21     methamphetamine, and that is the handgun which you see here.

22     Along -- and that little kit that you see below the handgun

23     is what is known as a presumptive test kit, which gives us an

24     indicator of the presence of methamphetamine to show that

25     there -- we believe that that is methamphetamine.

MONIS - DIRECT

1    Q. So it's your understanding that that same night or

2    evening of the transaction, there was a presumptive test

3    performed, chemical test performed on the substance that you

4    believed to be methamphetamine, and it, in fact, tested

5    positive as such?

6    A. Yes.

7              MR. KALOYANIDES: Objection, lacks foundation.

8              THE COURT:  Were you present when the presumptive

9    test was performed?

10             THE WITNESS:  Honestly, I don't recall.

11             THE COURT:  Are you familiar with the test?

12             THE WITNESS:  Oh, I do the test all the time.

13             THE COURT:  And can you describe what that is that

14   we are looking at?  It's not an ampoule, but looks like a

15   plastic container of some kind.

16             THE WITNESS:  What you see there, off to the right

17   there is a blue indicator.  If the substance that we put in

18   after we break the glass viles within that plastic container

19   represent a dark blue, similar to that what you see there,

20   that shows that there is a presumptive positive for the

21   presence of methamphetamine.

22             THE COURT:  Okay.  All right.  Thank you.

23             Go ahead.

24             MR. PETERSON: Your Honor, at this point I would like

25   to move Exhibits 31, 32 and 16 into evidence.

MONIS - DIRECT

 1          MR. KALOYANIDES: No objection to 32.  I think 31

 2     still lacks foundation, and 16 lacks foundation.

 3          THE COURT:  Is Agent Woolley expected to testify?

 4          MR. PETERSON: Woolley?

 5          THE COURT:  Yes.

 6          MR. PETERSON: Yes, Your Honor.

 7          THE COURT:  All right.  Good.  Then we will reserve

 8     the actual admission of the methamphetamine until such time

 9     as a chain of custody can be established, all right?  But the

10     weapon comes in.

11          MR. PETERSON: Your Honor, I'm sorry, just for the

12     record, and the photograph, Exhibit 16?

13          THE COURT:  What about it?  Oh, is the photograph

14     admissible?

15          MR. PETERSON: Exactly.

16          THE COURT:  Oh, yes.

17          MR. PETERSON: Thank you.

18          (Thereupon, Exhibit Numbers 32 and 16 were received

19     in evidence.)

20      Q. Investigator Monis, following your collection --

21     following your meeting with confidential informants on

22     January 14th, did you review the recordings that were made of

23     the meeting on -- in the Deglet Noor residence?

24      A. Yes, I've seen them.

25      Q. I would like to ask you to turn your attention now to

MONIS - DIRECT

 1    what has been marked for identification purposes as

 2    Government's Exhibit 12, also 13 and also 14.

 3              Starting with Exhibit 12, do you recognize that?

 4     A. That is a still photo of Angel Carmona that was taken

 5    from the surveillance video from the incident.

 6              MR. KALOYANIDES: Your Honor, may I confer with

 7    counsel?

 8              (Pause in proceedings.)

 9              MR. KALOYANIDES: Thank you, Your Honor.

10              Can we approach real quickly?

11              (At the bench.)

12              MR. KALOYANIDES: I've got no issue with referring to

13    CI-489 just by 489, but the witness has identified CI-5 by

14    his real name several times.  I don't want to run afoul, I

15    think originally we were going to refer to him as CI-5,

16    correct?

17              MR. PETERSON: Originally I was trying to keep it to

18    CI-5, otherwise known as Andy, also known as Gabe, and that

19    is the way we did the transcripts, but I agree with you.

20              MR. KALOYANIDES: I want to make sure if I

21    cross-examine and I refer to his name, I'm not running afoul

22    with any issue.

23              THE COURT:  Apparently everybody knows, right?

24              MR. KALOYANIDES: It sounds like everybody knows,

25    certainly.

MONIS - DIRECT

1            THE COURT:  He knows.

2            MR. KALOYANIDES: He knows, yes.

3            THE COURT:  If he knows, everybody knows.  Yeah, I

4    don't think any harm can be done at this point.

5            MR. KALOYANIDES: All right.

6            THE COURT:  I think that was the entire purpose of

7    that first witness list that we received when all these

8    people were to be writted out.  Okay.  All right.

9                (Thereupon, there was a brief recess.)

10                (Thereupon, the jury returned to the courtroom.)

11            THE COURT:  All right.  The jury has returned.  All

12   counsel and the defendant are present.  Inspector Monis has

13   resumed his place on the witness stand, and hopefully I can

14   regain some control over this courtroom.

15            Go ahead, counsel.

16   BY MR. PETERSON:

17    Q. Inspector Monis, I forget, right before we took a break,

18   if I had yet asked you to take a look at what's been marked

19   for identification purposes only as Government Exhibit 13.

20    A. Yes.

21    Q. And do you recognize that?

22    A. That is a still photo taken from the surveillance video

23   of Julio Gomez.

24    Q. And that is the video that you recovered, you and other

25   law enforcement recovered from the confidential informants

MONIS - DIRECT

1     following the meeting in the Deglet Noor residence; is that

2     correct?

3     A. Yes.

4     Q. I would like to ask you to turn your attention now to

5     what's been marked for identification purposes as Government

6     Exhibit 14.  Do you recognize that?

7     A. Yes.

8     Q. What is that?

9     A. That is a still photo from the surveillance video of

10    Steven Gonzalez.

11    Q. And the same surveillance video you were talking about

12    earlier; is that right?

13    A. Yes.

14    Q. I would like to change gears now and ask you, so far

15    we've talked about a January 7th meeting, we've talked about

16    a January 14th meeting.  Was there a subsequent meeting that

17    happened in or around the middle of February 2016?

18    A. Are you talking about the Whitewater?

19    Q. Yes.

20    A. Yes.

21    Q. And so what -- are you aware of whether or not a meeting

22    took place in, on or about February 17th, 2016, between

23    CI-489 and Defendant Gomez?

24    A. Yes.

25    Q. Were you involved in a planning meeting before that

MONIS - DIRECT

1    meeting?

2     A. Yes.

3     Q. And did you participate in surveillance while that

4    meeting took place?

5     A. Yes.

6     Q. While you were participating in surveillance, did you --

7    I'm sorry, let me take a step back.

8          You mentioned the word Whitewater; is that right?

9     A. Yes.

10     Q. Where did the meeting between Defendant Gomez and CI-489

11    take place on or about February 17th, 2016?

12     A. It was -- it's known as the Whitewater Rest Stop.

13     Q. And is that in relation to some kind of highway or

14    interstate?

15     A. It's right off the Interstate 10.  It's just before you

16    arrive to Palm Springs traveling eastbound I-10.

17     Q. And so is it your understanding that CI-489 was in

18    communication with Defendant Gomez and they agreed to meet at

19    that rest stop?

20     A. That's correct.

21     Q. Were you performing surveillance or observation when you

22    saw Defendant Gomez arrive at that location?

23     A. Yes.

24     Q. And how did you see him arrive?

25     A. He arrived as a passenger in a maroon Lexus.

MONIS - DIRECT

Q. And did you see anybody else in that vehicle?

A. There was a female driver.

Q. At the time that you saw her, did you know her?

A. I had no idea who it was at the time.

Q. Did you have an interaction with her later that helped you to recognize who the driver was of that vehicle that day?

A. Yes.

Q. And how did that interaction transpire?

A. As a part of this ongoing investigation, I met with -- her name is very unique, her last name is Awad, I believe, but I met with her at her residence in Beaumont.  And during that interaction with her, I saw the same vehicle that was used during the Whitewater deal.  And upon seeing her, I immediately recognized her as the same female driving the Lexus the day of the Whitewater incident.

Q. Now, when you initially went to speak with her, was that because of any awareness you had that she was the driver of the vehicle on that day in February of 2016?

A. No, because she was the female that was contacted during the search warrant execution, or I'm sorry, not the search warrant, but the arrest of Julio Gomez in Thousand Palms, she was the female that was present with him at the time of his arrest.

        And so when I contacted her later on, I then saw her for myself face-to-face and realized that was the same female

MONIS - DIRECT

1    driving the car at Whitewater.  And I actually asked her

2    about it and she gave a response.

3              MR. PETERSON: Your Honor, I have no further

4    questions for this witness on direct.

5              THE COURT:  All right.  Cross?

6              MR. KALOYANIDES: Thank you, Your Honor.

7                        CROSS-EXAMINATION

8    BY MR. KALOYANIDES:

9    Q. Good morning, Mr. Monis.  Is it mister or investigator?

10   A. Investigator.

11   Q. Investigator Monis, good morning.

12   A. Good morning.

13   Q. On direct you testified that -- well, let's strike that.

14             You have been in law enforcement over 27 years,

15   correct?

16   A. Roughly around 26.  27 years total.

17   Q. Your first agency you were with, I don't remember if you

18   said, which one was that?

19   A. Fowler Police Department.

20   Q. So you went to some sort of police academy?

21   A. Yes.

22   Q. And then you, as you progressed in your career, you

23   joined the Riverside Sheriff's Department?

24   A. First Desert Hot Springs and then the Riverside Sheriff's

25   Department.

MONIS - CROSS

1    Q. Did you go through any formal training at Desert Hot

2    Springs?

3    A. No.  I was already a police officer, so I was a lateral

4    transfer.

5    Q. What about any formal training to join the sheriff's

6    department?

7    A. No.  I was a lateral transfer.

8    Q. So you had ongoing training though --

9    A. Yes.  Just the typical POST mandated training that we go

10   through yearly.

11   Q. And then with Riverside, you testified you were part of a

12   gang task force, correct?

13   A. I had been on that same gang task force, both in the

14   capacity as a deputy sheriff with the Riverside County

15   Sheriff's Department, and also as a district attorney

16   investigator with the Riverside County District Attorney's

17   Office.

18   Q. All right.  So jumping ahead, no specific training

19   required to join Riverside DA's office as an investigator,

20   right?

21   A. Well, you have to have a certain amount of experience,

22   but you don't have to have -- per se have any additional

23   training.  It's just your experience level.  You have to have

24   so much time in an investigative assignment before you are

25   eligible even to apply for us.

MONIS - CROSS

1    Q. So no actual required classes you have to take before you

2    go there?

3    A. No.

4    Q. Okay.  So you've had some classroom early on in your

5    career to become a peace officer, right?

6    A. Correct.

7    Q. And then you've had ongoing training, regular training to

8    keep up with new techniques, technologies as your career

9    progresses, right?

10   A. Yes.

11   Q. Okay.  And with your experience, you might take

12   particular courses or go to seminars regarding specific

13   investigation techniques, right?

14   A. Yes.

15   Q. Something related to gang information, for example,

16   right?

17   A. Correct.

18   Q. Something related to drug trafficking, right?

19   A. Yes.

20   Q. Okay.  You also received training or seminars or

21   materials regarding the investigative techniques using

22   informants, right?

23   A. Sure.

24   Q. You learned about the risks of using informants, right?

25   A. Yes.

MONIS - CROSS

1    Q. The different types of informants that there are, I think

2    you testified to different kinds of informants, some that are

3    not working off a criminal offense or charge that they are

4    facing in court, right?

5    A. Yes.

6    Q. And then you've got some who are just being paid, right?

7    A. Correct.

8    Q. In your experience, have you ever dealt with an informant

9    who is currently being compensated monetarily, getting paid,

10   but was never facing criminal charges at any time in the

11   past?

12   A. Well, using them on a continual basis?

13   Q. Correct.

14   A. No.  Like if we do what is called -- we have a thing what

15   is called one time, where like somebody will provide us

16   information about a location of a homicide suspect or

17   information along those lines, and they don't have a criminal

18   background, but we paid them for that information.  So in

19   that aspect, yes.

20        But in thinking back in all my years, I mean, most

21   of them at some point probably had some type of interaction

22   on the negative side of law enforcement.

23   Q. Let me make sure the distinction is clear.  So there are,

24   let's call them individuals who provide a tip or information

25   about a specific event and might get a monetary reward for

MONIS - CROSS

1    that?

2      A. Correct.

3      Q. And then there are the informants that you actually sign

4    up under a contract as an ongoing investigative tool,

5    correct?

6      A. That's correct.

7      Q. And am I correct that the informants in your experience

8    who are those ongoing investigative tools, none of them were

9    completely clean of a criminal record, right?

10     A. I can't think of any specifically.  Maybe one or two have

11   slipped by over the years that I just don't remember, but I

12   will say at least 90 to 95 percent have had a negative

13   interaction at some point in their life with law enforcement.

14     Q. So is it fair to say, to generalize, that most of the

15   informants you've dealt with on an ongoing basis started

16   sometime because of a criminal charge or interaction where

17   they could be facing criminal charges?

18     A. The majority of our informants actually, at least in my

19   world, what I do, that is how they actually start.  It's very

20   rare to find an informant right from the get-go that is

21   starting in a payment plan, if you want to call it that.

22   They usually start on a DA contract.  Once they complete

23   their DA contract, they transition into a monetary role.

24     Q. And the informants you've dealt with over the years, they

25   don't get any specific training in investigative techniques,

1    right?

2     A. No, other than what they just learned I guess firsthand

3    when they work with us on a continual basis.

4     Q. The -- in all your time in law enforcement, you've never

5    participated in a formal seminar for informants, right?

6     A. I have actually had informants -- I put on training

7    classes, informant training classes as an instructor.  And

8    I've actually brought informants to that class to talk to the

9    class about their experiences working for law enforcement.

10   So I basically have.  And I've also been present where

11   informants have come with a handler to discuss their

12   interactions of working with law enforcement.

13          So I have -- I've actually seen it where they talk

14   to us, but I haven't like taken them to go sit down and

15   listen to a class, vice versa.

16    Q. Right.  And so informants need to be controlled by their

17   handlers, right?

18    A. Yes.  Correct.

19    Q. Okay.  And you described a handler as -- well, I think

20   you described yourself as a handler as you are getting the

21   information from the informant, right?

22    A. Correct.

23    Q. You are the go-between with the DA's office, right?

24    A. Yes.

25    Q. You keep some sort of regular contact with the informant

MONIS - CROSS

1    to monitor their activities, right?

2     A. Yes.

3     Q. And to be clear, that is not a constant monitoring of the

4    informant?

5     A. Oh, 100 percent no.

6     Q. And it's not even like daily, right?

7     A. It's -- no, not even close.

8     Q. Okay.  And then you are supposed to also -- you described

9    it as report mishaps to the DA.  Do you remember saying that?

10    A. Yes.

11    Q. Now, when you said "mishaps," what you mean is if they

12   are violating the terms and conditions of their contract,

13   right?

14    A. For instance -- yeah.  For instance, if they get stopped

15   by law enforcement on a traffic stop, and then they call me

16   and say, Hey, I just got stopped, or I just got picked up a

17   new criminal charge, or vice versa, law enforcement contacts

18   me and says, We just had an interaction with so and so who

19   says he's working for you.  What I do is obtain as much

20   information as possible, and then the DA that is in charge of

21   deciding whether or not to continue on working with them or

22   not is then given that information for *Brady* purposes.

23        And then they basically make a determination whether

24   or not we can continue on and modify the contract or cease

25   and desist.  And basically now he's got to face the

MONIS - CROSS

1      consequences for violating the terms and conditions.

2       Q. In your experience with the Riverside County DA's Office,

3      you are familiar with the contracts with informants, right?

4       A. Yes.

5       Q. And bottom line is they are not allowed to go out and do

6      their own investigation, right?

7       A. When you say "their own investigation," what do you mean

8      by that?

9       Q. They are not allowed to go out and try to set up deals

10     without their handler knowing or being specifically

11     instructed to do so, right?

12      A. That is a yes and no question.

13      Q. Okay.  Let's unpack that.

14          So normally they are under the instruction of the

15     handler, such as you, you direct them, Hey, we are going to

16     go do thus and such, and here is what I want you to do, and

17     they are supposed to follow what you tell them, right?

18      A. Yes.

19      Q. They are not supposed to go out there and set up a deal

20     on their own, separate from what you've instructed them to

21     do?

22      A. Okay.

23      Q. Let me clarify that.  That was not a really clear

24     question.

25          Sometimes they are going to encounter a situation

MONIS - CROSS

1    that they didn't know about and they are going to report that

2    to you.  They may tell you there is somebody out there that

3    is something -- to do something, right?

4     A. Yes.

5     Q. Okay.  But they are not allowed to actually set up a drug

6    transaction privately without notifying you, right?

7     A. Well, I would hope that they notify me.  That is the --

8    that is -- the instruction is to notify us.  But at the same

9    time, I'm asking them and CI-5, CI-5 was instructed to

10   basically go out and set up future narcotic deals or gun

11   deals, and then notify us when an individual has agreed to do

12   so.

13        And then we would at that point get more -- get

14   CI-489 involved, or a UC, or another informant involved and

15   then actually set up the day of the deal.  But he was given

16   permission to facilitate and try to structure something to

17   happen.

18    Q. You had given him that prior instruction?

19    A. Yes.

20    Q. Okay.  And bottom line is, the contract is violated if

21   they commit a crime, right?

22    A. It should be, yes.

23    Q. Okay.  And that is something you have to report to the

24   DA?

25    A. Yeah.  And ultimately, it's the DA's decision whether or

MONIS - CROSS

1    not to continue on working with them.  But if it's an obvious

2    violent crime or something like that, I know just out of, you

3    know, using common sense that that is going to be a

4    no-brainer.  But if it's a nonviolent crime, then the report

5    would go, at least verbal, to the DA overseeing it.  And then

6    they would give us the direction where you can continue to

7    work on a modified contract or cease and desist immediately.

8     Q. So your responsibility ends with reporting the violation,

9    right?

10    A. Correct.

11    Q. And the DA has control over what the effect of the

12    contract with that CI will be?

13    A. That's correct.

14    Q. Okay.  All right.  So let's -- let's go back and talk

15    about Andy, or Stranger, or CI-5 --

16    A. Okay.

17    Q. -- Mr. Lopez.  He's also known -- he also had another

18    name, Marino, I think?

19    A. Oh, I've only known him as Lopez.  He might have in the

20    CII in his names, but I only knew him as the ones you already

21    mentioned.

22    Q. Right now I'm going to direct your attention to Defense

23    Exhibit 301.  And just take a look at that first page there.

24    A. Is this the secure tracking?

25    Q. I don't know.  Have you ever seen that document?

MONIS - CROSS

1    A. I saw it earlier when the government showed it to me, but

2    I hadn't seen it until today.

3    Q. Okay.  But the name on there, that is CI-5, right?

4    A. Yes.

5    Q. Okay.  All right.  We'll come back to this in a moment.

6    All right.  So you testified that originally you started

7    looking into Mr. Gomez in an investigation capacity because

8    his parole officer notified you that he was a, I think you

9    used the word high risk, yes?

10   A. Manny Ortiz supervised a unit which is known as the high

11   risk GPS offender program, and it was commonly high risk gang

12   members, like higher-level gang members in the community.

13   And Mr. Gomez was one of, I don't know if he carries 10 or 15

14   subjects on his caseload, but he was one of the subjects on

15   his caseload.

16         And basically, I would go to him and talk to him

17   about target -- potential targets who are out on the streets,

18   and if he thinks that they are doing anything bad.  So that

19   is part of the way I would develop potential investigative

20   tools.

21   Q. When did you have that conversation with Mr. Ortiz?

22   A. Oh, honestly, I couldn't tell if it was November,

23   October, just in passing.  He and I would have a conversation

24   every now and then.  And a lot of times, I would do nothing

25   with the information, and other times I would look into it.

MONIS - CROSS

1    And I honestly couldn't tell you, but it was definitely, I

2    mean, some time, a month or two prior to doing anything.

3    Q. Okay.  So sometime in 2015?

4    A. Yes.  Yes.  Yes.

5    Q. All right.  Do you know when Mr. Gomez was on GPS through

6    Officer Ortiz's supervision?

7    A. I don't.  The specific dates I do not.

8    Q. At some time did you request the historical location

9    information for Mr. Gomez on the GPS?

10   A. On -- for sure for the Whitewater incident, yes.

11   Q. Did you ask for all of the history or just surrounding

12   that date?

13   A. I believe it's probably just that date.

14   Q. But you don't recall?

15   A. I honestly don't recall.

16   Q. So you don't know when that GPS actually was placed on

17   Mr. Gomez?

18   A. I don't know when he actually got that ankle monitor

19   assigned to him.

20   Q. Now, you testified before the grand jury in this case,

21   right?

22   A. I did.

23   Q. And you were asked a lot of the same questions we are

24   talking about, the various transactions as we are talking

25   about today, right?

MONIS - CROSS

1      A. Right.

2      Q. I would like to direct your attention to Defense

3      Exhibit 309, please.  Take a look at that and let me know

4      when you've had a chance to glance at it.

5      A. Okay.  I have the document.  Is there a specific page?

6      Q. Yeah.  First question is, this is the transcript of your

7      testimony, right?

8      A. It appears to be, yes.

9      Q. Have you reviewed it?

10     A. Um, yeah, I have read it over since the government has

11     let me look at it earlier.

12            THE COURT:  Is this something that the government

13     has previously sought and been granted permission from the

14     Court to have unsealed?

15            MS. LEE:  To produce for discovery to the defense

16     several months ago, Your Honor.

17            THE COURT:  Okay.  Any other -- any other

18     limitations placed on this?

19            MR. KALOYANIDES:  Not to my knowledge, Your Honor.

20            THE COURT:  Okay.

21     Q. Directing your attention to page 4, line 13.  You were

22     asked if you knew a person named Julio Gomez, right?

23     A. I'm trying to get to that real quick.

24     Q. I'm sorry.  Page 4 on the bottom.  It's Bates 4524.

25     A. Okay.

MONIS - CROSS

1    Q. You were asked if you were familiar with an individual

2    named Julio Gomez, right?

3    A. Yes.

4    Q. You said you were?

5    A. Yes.

6    Q. You were asked how did you become familiar with him,

7    right?

8    A. Yes.

9    Q. Your answer was, "I became familiar with him through a

10   confidential informant that made me aware of Julio Gomez,

11   known as CI-5, and that individual explained to me that Julio

12   Gomez had recently gotten out of state prison and was

13   basically in the control of the streets."

14           And you go on and talk about him, right?

15   A. Yes.

16   Q. You didn't say that Officer Ortiz alerted you to him,

17   right?

18   A. Well, Officer Ortiz wasn't --

19   Q. You didn't say --

20           THE COURT:  Hang on.

21   Q. Officer Ortiz alerted you to him, right?

22   A. That's correct.

23   Q. So actually it was Stranger who told you, Hey, I know

24   this guy, right?

25   A. According to the transcript, you are correct.

MONIS - CROSS

1    Q. You were under oath, right?

2    A. Yes.

3    Q. Any reason to think that your transcript -- your

4    testimony from -- it was back in 2016, right?

5    A. That was 2016, correct.

6    Q. June 15th, 2016, right?

7    A. That is correct.

8    Q. And the first meeting between Stranger, CI-5 and

9    Mr. Gomez was January of 2016, right?

10   A. Correct.

11   Q. Any reason to think your memory of what happened and how

12   you first came to know about Mr. Gomez in 2016 is incorrect?

13   A. That is -- you are correct.  And also my other answer is

14   correct.

15   Q. Now, you testified that you became involved with

16   Stranger, CI-5, Mr. Lopez, sometime early 2015 is when you

17   started developing him as an informant, right?

18   A. CI-5 started working for us, I want to say end of August,

19   beginning of September of 2015.

20   Q. You mentioned that he was facing some charges, right?

21   A. Yes.

22   Q. But that you felt he could be a very valuable

23   investigative tool, yes?

24   A. Yes.

25   Q. You used a phrase, and this is where I'm getting -- you

MONIS - CROSS

1   used a phrase that what he was facing, or rather the

2   investigations you wanted to use him for, were larger than

3   the criminal activity he was engaged in, or something like

4   that.  Do you remember testifying like that?

5   A. Yes.

6   Q. Okay.  What do you mean by that, larger than what he was

7   facing?

8   A. Because there was some gang homicides that we were

9   looking into that were unsolved that we felt that he would be

10  able to assist us on, along with multiple targets in the

11  Desert Hot Springs area.  And so the potential of information

12  that he was going to provide was larger than, in my opinion,

13  than what he was being charged with on the state side, if

14  that makes sense.

15  Q. Okay.  And you said that he was being charged in

16  connection with some gang activity related to his membership

17  in the North Side Indio gang?

18  A. No, North Side Indio gang was just the gang that he was a

19  member of.  It was more of a Mexican Mafia investigation that

20  ultimately took place.  He just happened to be a North Side

21  Indio gang member entrenched in the Mexican Mafia politics.

22  Q. That is Stranger, right?

23  A. That is Stranger.

24  Q. Would you, in your experience as a gang investigator,

25  consider somebody who is involved with the Mexican Mafia

MONIS - CROSS

1    prison gang a small or a serious case?

2     A. Serious.

3     Q. I think you said he was implicated or charged with meth

4    distribution, right? Methamphetamine distribution?

5     A. Yes.

6     Q. And also some sort of firearms charges?

7     A. I don't know if any firearms were ever charged against

8    him, because I don't think we recovered any on him.

9     Q. Okay.  So at some point you and Stranger discuss looking

10   into Mr. Gomez, right?

11    A. Yes.

12    Q. At some point, as you testified at the grand jury, he

13   brings Mr. Gomez to your attention.  And at some point you

14   decide you want him to start engaging Mr. Gomez, right?

15    A. Yes.

16    Q. To your knowledge, did Stranger know Mr. Gomez before

17   that?

18    A. Um, it didn't appear that he had a previous relationship

19   with him, no.  He knew of him, but didn't know him like on a

20   personal level.

21    Q. So he did -- to your knowledge, he didn't have any direct

22   interaction, but knew the name or knew of him generally in

23   the community?

24    A. Correct.

25    Q. Other than what Stranger told you about Mr. Gomez at that

MONIS - CROSS

1    time, did you have any other indication or information that

2    Mr. Gomez was committing any crimes?

3    A. No.

4    Q. You said -- you testified to the jury that you talked to

5    Parole Officer Ortiz, and he identified Mr. Gomez to you.

6    Did you find out anything from Officer Ortiz or his file that

7    said he's now committing crimes or might be committing

8    crimes?

9    A. No, because I think he would have been violated on his

10   parole if Ortiz had -- could prove that he was actively doing

11   something.

12   Q. Okay.  So is it correct to say that other than what Lopez

13   told you, what Stranger told you, there was no independent,

14   objective information to suggest Mr. Gomez was committing any

15   crime?

16   A. At the time that we first came aware of Mr. Gomez, not

17   even Lopez said that he was committing crimes.  Just he

18   entered, basically said that this guy is -- his name is out

19   there and he's running the streets.  So basically, based on

20   that information, along with other information from Ortiz and

21   other people, it basically -- we said, let's see if we can

22   look into it and see what is there.

23   Q. Okay.  You mentioned you were one of Strangers' handlers,

24   right?

25   A. Yes.

MONIS - CROSS

1    Q. Was he working with other agencies, to your knowledge?

2    A. No.  Well, us and ATF.

3    Q. Okay.  So the only two handlers would have either been

4    you or somebody at ATF?

5    A. Jesse Woolley.

6    Q. That is all you were referring to?

7    A. Yeah.

8    Q. There weren't other agencies with other handlers?

9    A. No.

10   Q. All right.  Now, you testified about what the contract or

11   the deal for Stranger was, that he had some pending cases,

12   and he was to provide information that needed to result in

13   the filing of charges against other individuals.  That was

14   part of the requirement that the DA had for him, right?

15   A. He needed to provide corroborated information that

16   eventually would lead to seizure of evidence, filings in

17   criminal cases, arrest of individuals, and all that was

18   pretty much documented.  Other information that could lead to

19   other investigative means.

20   Q. Do you remember that his contract specifically said there

21   needed to be 10 filed cases?

22   A. Specific amount, I don't know.  I do have a list of the

23   cases that he provided us, which is -- might be exceeding 10.

24   Q. Direct your attention to Defense Exhibit 305.  If you

25   could thumb through that, just let me know when you have it.

MONIS - CROSS

1      And the question is whether you recognize --

2       A. I recognize this document.  This is the initial contract

3      that he provided -- he signed.

4       Q. Is that the initial?

5       A. Yeah, we -- ultimately there was two contracts that were

6      drafted for him.  I'm sorry, this is the second one.  I'm

7      sorry.

8       Q. This is the second?

9       A. Sorry about that.

10      Q. So direct your attention to, it's the fifth page in, but

11     the page number at the bottom says page 2.

12      A. Correct.

13      Q. All right.  It says, "Section 2 Representations"?

14      A. Yes.

15      Q. If you read the Section A-1 --

16      A. Um-hum.

17      Q. -- and let me know if that refreshes your recollection as

18     to what his original requirement was under the first crime.

19      A. Do you want me to read it out loud?

20      Q. No just to yourself, please.

21      A. Okay.  Okay.

22      Q. What was the requirement originally for him?

23      A. Um, well, if I'm reading this correctly, it would have

24     been -- he would have had to have done a total of 15.  So the

25     first one should have been 10 and then the second one was an

MONIS - CROSS

1    additional five.

2     Q. And why was that additional five required?

3     A. Because he had violated the terms of his original

4    contract.

5     Q. He committed additional crimes, right?

6     A. Yes.

7     Q. He committed additional crimes in January or February of

8    2016, right?

9     A. The exact dates I don't know, but I wouldn't argue with

10   you on that.

11    Q. But it was early 2016, right?

12    A. Sure.

13    Q. While he was helping you investigate Mr. Gomez, right?

14    A. Yes.

15    Q. Now, Investigator Monis, if you would, please -- I mean,

16   Monis -- if you would please just make sure you've looked at

17   every page, because I want to make sure that there is nothing

18   in here that hasn't been properly redacted.

19    A. It appears, based on what I see, that the proper

20   redactions were done.

21    Q. Okay.  And your signature is on some of the papers,

22   right?

23    A. Yes.  Yes.

24           MR. KALOYANIDES: Your Honor, may I publish --

25           THE COURT:  Yes.

MONIS - CROSS

1            MR. KALOYANIDES -- 305? And if I could have the Elmo

2       or the document camera turned on.

3        Q. And this is the page that you looked at that shows the

4       additional requirement for Stranger, right?

5        A. Yes.

6        Q. Okay.

7        A. Yes.

8        Q. He also had to plead guilty to some charges as a result,

9       right?

10       A. Yes.

11       Q. You testified that part of his deal would be that he

12      would get a suspended sentence if he completed his contract?

13       A. Yes.

14       Q. And do you know what he was facing?

15       A. Um, I believe it was like over 50 years.  I mean, if you

16      took the whole thing the way it's written in the letter of

17      the law, I think his maximum exposure could have been over

18      50 years.

19       Q. So he was potentially facing a sentence of over 50 years

20      in prison if he did not do what he was supposed to do under

21      this contract, right?

22       A. Potentially he could have, yes.

23       Q. And he did actually violate the contract, right?

24       A. Yeah, he's in prison now.

25       Q. Well, he violated and then the DA allowed him to do a new

MONIS - CROSS

1    contract?

2    A. He violated the first contract, he got the second

3    contract, then he violated that one.  Now he's currently in

4    prison.

5    Q. You testified that you eventually found out he actually

6    had a GPS monitoring, an ankle bracelet, right?

7    A. Yes.

8    Q. That is not something -- you testified I think that it

9    was something that the Riverside County Sheriff's Department

10   put on him?

11   A. I'm not sure if it's probation or the sheriff's

12   department.  I'm not sure who actually maintains that.  It's

13   one of the two.

14   Q. When did you find out he had an ankle monitor?

15   A. Oh, I think that -- I recall him having the ankle

16   monitor.  That is not in dispute.  I remember him even

17   calling, basically complaining about he used to call it this

18   ATM bank on his ankle.  I just never thought about, you know,

19   like when we took down the case, and we take everything down,

20   I just never, or Jesse Woolley or anybody really thought

21   that, hey, wait a minute, there might be some data on this

22   GPS ankle monitor or anything.  It never even crossed my

23   mind --

24   Q. Okay.  So --

25   A. -- passport.

MONIS - CROSS

1    Q. I'm sorry.

2    A. I just never thought about requesting data for that,

3    because it completely, just honestly, I didn't think much

4    about it.

5    Q. So when did you learn the first time that he actually had

6    the ankle monitor? Was it the first time you met him, was it

7    when --

8    A. Oh, no.  He got it put on after he started working for

9    us.

10   Q. Do you remember when?

11   A. I don't.  I don't.  I don't know the dates.

12   Q. But you just didn't think you needed to check the

13   historical data of where he had been, right?

14   A. It never even crossed my mind.

15   Q. Okay.  Now, one of the things that you know in dealing

16   with an informant who is working for you is you have to be

17   very careful, I think you described it, to protect the

18   integrity of the investigation, right?

19   A. Sure.

20   Q. And that means you've got to make sure they are following

21   the rules very strictly, so they are not doing anything on

22   the side and committing crimes during a transaction, for

23   example, right?

24   A. Most importantly during a transaction.

25   Q. So, for example, if you front money to an informant, you

MONIS - CROSS

1     want to make sure you get all the money back, or whatever

2     they were supposed to buy back from the informant, right?

3      A. Correct.

4      Q. So you described before the January 7th meeting with

5     Mr. Gomez that both Stranger and CI-489, their vehicle was

6     searched for contraband?

7      A. Yes.

8      Q. And contraband, meaning anything they shouldn't have that

9     could compromise the investigation, right?

10      A. Correct.

11      Q. Okay.  You put the GPS on the vehicle?

12      A. Yes.

13      Q. Did you search their persons?

14      A. Yes.

15      Q. And when they come back after whatever the transaction

16     was going to be, January 7th, the meeting, you again searched

17     the vehicle, right?

18      A. Yes.  Yes.

19      Q. You take the GPS, right?

20      A. That's correct.

21      Q. If a transaction occurred, you take whatever evidence,

22     right?

23      A. Yes.

24      Q. And on the 7th, there wasn't any?

25      A. No, not on the 7th, there wasn't.

MONIS - CROSS

1    Q. Okay.  Do you search the person again?

2    A. Yes.

3    Q. You mentioned that after the meeting on the 7th there was

4    this, I think you used the term debrief.  What is a debrief?

5    A. It's basically where when we are collecting the equipment

6    from CI-5 and CI-489, we basically ask them for a summary of

7    what occurred, and they give us basically what they -- what

8    they encountered.  And at that point that is when CI-489

9    indicated that the -- he had a future deal set up between

10   Carmona and Gomez.

11   Q. Okay.  You write reports as you are doing any

12   investigation, right?

13   A. Well, on this particular one, it was primarily Jesse was

14   writing it, but yeah, somebody is going to write something.

15   Q. So generally speaking, it's important to document what

16   you are doing in an investigation, correct?

17   A. Sure.

18   Q. And that would be important information to the

19   investigation.  In other words, you don't write necessarily a

20   transcript of every conversation you have related to an

21   investigation, right?

22   A. No.  Basically a report is not obviously evidence, a

23   report is basically to help an investigator or an attorney

24   recollect the incident that occurred until we testify in

25   court.  It's just something -- it's a tool that is used to

1    refresh our memory.

2    Q. Okay.  And do you remember if anyone wrote a report

3    regarding the debrief of the 7th?

4    A. If it was, it should have been Woolley.

5    Q. Okay.  So you didn't?

6    A. I don't -- I don't recall writing one.

7    Q. Okay.  Did you testify whether or not CI-6 was present at

8    the January 7th meeting?

9    A. I don't believe she was there.

10   Q. Okay.  So you had testified that it was important -- the

11   reason you signed her up was because it was important to keep

12   the appearance that Stranger was still active in the

13   community doing whatever he was doing, right?

14   A. That was in Desert Hot Springs because that is where he

15   was living at the time, and they were together everywhere in

16   Desert Hot Springs.  Not every incident was she there, the

17   majority of stuff she was present.

18   Q. Okay.  But she was not there on the 7th?

19   A. No.

20   Q. Okay.  Let's turn to the 14th.  Let's strike that.

21          The 7th and the 14th, February, what was it, 17th,

22   of those three interactions between one of your CIs and

23   Mr. Gomez, did you provide the money to the informants?

24   A. No, ATF.

25   Q. Okay.  Did you collect any of the materials purchased on

MONIS - CROSS

1      any of the dates?

2       A. ATF.

3       Q. Okay.  The -- let's go to the 14th now.  So January 14th

4      of 2016 it was arranged to go to what you called the Mountain

5      View location, correct?

6       A. Yes, sir.

7       Q. Do you remember if the address was 82723 Mountain View in

8      Indio?

9       A. That sounds correct.

10      Q. Okay.  And then beforehand did you know that there was

11     going to be a change in location?

12      A. No.

13      Q. All right.  They do eventually go to the Deglet Noor

14     location, right?

15      A. You are correct.

16      Q. And that would have been 43299 Deglet Noor?

17      A. Yes, sir.

18      Q. All right.  I would like you to take a look at

19     Exhibit 302, Defense Exhibit 302.  And are you familiar --

20     well, take a look at that and let me know when you've looked

21     at the two pages.

22      A. Yes, sir.

23      Q. Are you familiar generally with the area in Indio of

24     Mountain View Avenue?

25      A. Yes.

MONIS - CROSS

1    Q. Looking at the first page of Exhibit 302, that is a

2    Google map, right?

3    A. Yes, sir.

4    Q. Is that an accurate depiction of the address location of

5    82723 Mountain View?

6    A. It appears to be.

7    Q. On page 2, are you familiar with the Deglet Noor -- well,

8    strike that.

9          You actually drove by the address, right?

10   A. Yes, we saw the cars parked out in front of the

11   residences during the operation.

12   Q. There is a photograph in the upper, left-hand corner on

13   that first page.  Do you see that?

14   A. Yes, sir.

15   Q. Is that an accurate depiction of the residence?

16   A. I mean, it appears from the photo.

17   Q. Second page.  You are familiar with Deglet Noor Street?

18   A. I am.

19   Q. Is that the approximate location of 432919 Deglet Noor?

20   A. It appears to be, yes, sir.

21   Q. Is that photograph, to your recollection -- you drove by

22   the Deglet Noor address, yes?

23   A. Yes, we did.

24   Q. And does that photograph accurately depict --

25   A. It appears consistent.

MONIS - CROSS

1              MR. KALOYANIDES: Your Honor, may I publish?

2              THE COURT:  Yes.

3     Q. All right.  So the 82723 Mountain View Avenue location is

4     in between Towne and Deglet Noor?

5     A. Yes, sir.

6     Q. A little closer to Towne, right?

7     A. Yes, sir.

8     Q. And then the Deglet Noor address, it's almost at the

9     intersection with Oleander, right?

10    A. It's really blurry.  Could you --

11    Q. I'm sorry.  Let's back it out and see if that will help.

12    There we go.  How is that?

13    A. Yes.

14    Q. Now, what time, do you remember, if you remember, did

15    Stranger, CI-486 arrive at the Mountain View on the 14th?

16    A. Probably 6-ish, around 6.  Right off the top of my head I

17    don't recall.

18    Q. Are you familiar with what's commonly known as military

19    time or 24-hour time?

20    A. Yes, sir.

21    Q. What does that mean to you?

22    A. Well, instead of 6 PM, it would be 1800.

23    Q. I'm going to direct your attention to Defense

24    Exhibit 301.  Are you familiar with the company Satellite

25    Tracking of People LLC?

MONIS - CROSS

1    A. No.

2    Q. Are you familiar with Securus Technologies?

3    A. Their phone system, not their tracking.

4    Q. Eventually when you requested the information regarding

5    Mr. Gomez's historical location for sometime in February of

6    2016, you contacted Satellite Tracking of People, right?

7    A. Contacted Manny Ortiz.

8    Q. Actually, take a look at Defense Exhibit 311, please.  Do

9    you recognize that document?

10   A. I mean, I think it's -- I don't, but --

11   Q. You don't recall ever seeing that document?

12   A. No.

13   Q. You don't recall ever receiving a letter from Satellite

14   Tracking of People regarding your request concerning the

15   historical tracking for Mr. Gomez?

16   A. I don't.  Did I turn this in to -- I don't know.  I'm not

17   saying that I didn't, I just don't recognize it, to be honest

18   with you.

19   Q. Okay.

20          THE COURT:  There is no question.  Relax.

21   Q. I'm going to direct your attention to page -- to back to

22   301.

23   A. 301.  Okay.

24          MR. KALOYANIDES: Your Honor, may I publish page 26?

25          THE COURT:  Any objection?

MONIS - CROSS

1           MR. PETERSON: No, Your Honor.

2      Q. This is a very difficult document to see because it's so

3      small.  I'm hoping I'm going to be able to zoom in.

4           THE COURT:  You are not going to be able to zoom in

5      that much.

6      Q. There it is.  Let's see if we can get it even better.

7      There it is.  Okay.  So I'm going to be moving this up and

8      down a bit, so we can --

9           THE COURT:  Oh, I want to die.

10          MR. KALOYANIDES: I'm going to be very brief, Your

11     Honor, with this.  Fear not.

12     Q. You see the categories, the descriptors up top in the

13     dark gray here?

14     A. Yes, sir.

15     Q. Are you familiar what UTC time is?

16     A. I do not.

17     Q. Okay.  You are familiar, though, with when something says

18     local time, meaning the time and the location, generally

19     speaking, when someone says local time, right?

20     A. You mean like local time being right now being almost 11?

21     Yes.

22     Q. As opposed to Eastern Daylight Time, right?

23     A. Yes, sir.

24     Q. You don't know what UTC means?

25     A. No.

MONIS - CROSS

1    Q. I'm going to try to stay in the column.  And this is

2    where the difficulty comes.  Local time, right?  Everything

3    will stop shaking here.  All right.  So there we get to

4    January 14th, 2016, about 1800.  Do you see that? My pen was

5    right there a moment ago.

6    A. Okay.  Yeah, I see it.

7    Q. All right.  Now, you see if you go to the left, the name

8    is Lopez, Anderzel, right?

9    A. Yes, sir.

10   Q. That is Stranger, right?

11   A. Yes, sir.

12   Q. Okay.  So you see that there are these numbers here,

13   33.733771, and minus 116.220588 at that time on that date,

14   right?

15   A. At the 1800:33?

16   Q. Yes.

17   A. Um, I see 33.733743 and then -116-221164.

18   Q. Okay.  I might have been reading the number below that,

19   but correct.  Okay.  You see that.

20          All right.  Now I'm going to move back up, trying to

21   keep the column straight.  And I apologize to the jury.  You

22   see the top where it says GPS latitude, GPS longitude?

23   A. Yes, sir.

24   Q. You know what latitude and longitude are?

25   A. Yes.

MONIS - CROSS

1    Q. And those are positions on the planet, right?

2    A. Yes.

3    Q. Okay.  So on the 14th, January 14th of 2016, these are

4    the locations where Stranger was, right?

5    A. Yes.

6    Q. I went too far.  I'm sorry.  There we go.

7            All right.  So to the best of your recollection,

8    Stranger was supposed to be at the Mountain View address at

9    or about 6 PM January 14th, 2016, right?

10   A. Approximately, sure.

11   Q. Right.  And he was there for about 30 minutes before

12   Mr. Gomez showed up, right?

13   A. Um, I won't argue with you on that.

14   Q. Do you remember?

15   A. I honestly don't.

16   Q. But Mr. Gomez didn't show up right away?

17   A. No.

18   Q. There was a period of time?

19   A. Yes.

20   Q. And you were driving around with ATF in the area doing

21   surveillance, but you weren't parked watching, right?

22   A. No, we -- we couldn't sit on that street without getting

23   burned, so we parked kind of out of sight.  In fact, we

24   parked, I believe like on King Street and Kenner.  And we

25   couldn't actually see Mountain View, so every, I don't know,

MONIS - CROSS

1      every so often, whether it was myself or somebody else, would

2      drive down the street, just to make sure that the car was

3      still there, and the people are still sitting in the car,

4      what was going on.

5       Q. You were listening to the audio line, right?

6       A. What we could hear.  It would come in, it would come out,

7      so the best that we could.

8       Q. Okay.  So you don't have eyes on Stranger, but you did

9      see him go to that address, right?

10      A. We saw him physically park in front of the Mountain View

11     location, or pull down the street, and then we continued on

12     past him.  He pulled to the front of a residence, which was

13     consistent being near the Mountain View address.  We

14     continued on out of sight.  And then every now and then

15     somebody would drive down Mountain View or drive down Towne

16     or down Deglet Noor to see if the vehicle was still parked in

17     that general area without getting burned.

18      Q. And when you say "without getting burned," without anyone

19     realizing you were law enforcement?

20      A. Correct.

21      Q. During that time before Mr. Gomez showed up, other people

22     were going to that address besides Stranger and CI-489,

23     right?

24      A. I know that the other people interacted with them during

25     that incident.

MONIS - CROSS

1        Q. "Them" being who?

2        A. I know for sure Gonzalez was talking to somebody.  And

3    maybe somebody walked by and -- I don't know, somebody else,

4    I mean, I didn't see any cars pull up, but foot traffic-wise,

5    is what I'm saying.

6        Q. All right.  And you referred to Mr. Gonzalez

7    previously --

8        A. Cub, yes.

9        Q. -- as Cub?

10       A. Yes.

11       Q. And do you know if that was his residence or where he

12   stayed or --

13       A. I believe it's his grandmother's residence.

14       Q. A relative's residence.  And a lot of foot traffic, a

15   lot -- there were several individuals who walked up to him

16   and had some sort of interaction with him?

17       A. From what I recall, yes.

18       Q. Okay.  Not Mr. Gomez at that point?

19       A. No, Mr. Gomez wasn't there.

20       Q. Okay.  Did you ever find out what was going on?

21       A. With?

22       Q. With the individuals that had approached Mr. Gonzalez?

23       A. Well, based on what CI-489 later told us, he believed

24   that there might have been a hand-to-hand transaction.

25       Q. We'll leave that and see what his recollection is,

MONIS - CROSS

1    because you testified you didn't see that, right?

2     A. No.  No, I didn't see any of that.

3     Q. Prior to Stranger going to the Mountain View residence on

4    the 14th, you had a meeting with him and CI-489 to set up

5    what was supposed to happen on that transaction, right?

6     A. Yes, sir.

7     Q. And you went through the regular search of the vehicle,

8    put the GPS on the vehicle, search their person, and somebody

9    from ATF gave CI-489 some money, right?

10    A. Agent Woolley did.

11    Q. You see that?

12    A. Yeah, I was there.

13    Q. And you had a little discussion with the whole team as to

14   what was going to go down, right?

15    A. Yes.

16    Q. Prior to that, when was the last time you personally met

17   with Stranger?

18    A. Um, honestly, I don't know.

19    Q. Well, let me ask a simple question:  Do you know where he

20   was on January 12th, 2016?

21    A. January -- no.  I mean, off the top of my head, no.

22    Q. You don't remember if he was with you?

23    A. No.

24    Q. And to your recollection, there would be several days

25   where you would have no contact with him, right?

MONIS - CROSS

1      A. Um, sometimes I would talk to him every day, sometimes I

2      would talk to him a couple days in between.  There was

3      nothing consistent.

4      Q. And as you sit here today, you have no recollection of

5      where he could have been on the 12th of January, 2016, right?

6      A. I don't remember.

7      Q. And would that be the same for the 13th of January, 2016?

8      A. That's correct.

9      Q. And he never told you that he had met with Mr. Gomez any

10     time between January 7th at the restaurant and January 14th

11     at Mountain View, right?

12     A. No.

13     Q. He never said anything about that, right?

14     A. No.

15     Q. As a handler, you just -- strike that.

16            You described Stranger as a high risk informant,

17     right?

18     A. Yup.

19     Q. That is because -- well, tell the jury why you call him a

20     high risk?

21     A. Do I think that Stranger was probably doing things behind

22     my back without my knowledge?  100 percent correct.  I --

23     Q. I'm sorry.  Go ahead.

24     A. 100 percent correct.

25            And when I say he's a high risk informant, that is

MONIS - CROSS

1    why there was safety nets put into place, being 489 and stuff

2    like that, to ensure when we were directly involved in the

3    investigation portion of it, that we were on the up and up,

4    and we were doing the investigation to the best that we

5    possibly could do.

6    Q. You didn't trust him?

7    A. What's that?

8    Q. You didn't trust Stranger?

9    A. Not necessarily didn't trust him, I made sure that what

10   we did with him, it was corroborated through other people.

11   He never gave me bad information.  That is the one thing I

12   can say is that he never lied to me.

13         So saying that, but did I believe that he was a high

14   risk in the sense of probably doing stuff on the side?  He

15   got arrested, he went to prison for doing stuff on the side.

16   Q. Did he tell you about that?

17   A. Do I expect him to?  No.

18   Q. So you said he never lied to you, but he wasn't

19   completely honest with you, either?

20   A. If I asked him a direct question, he had never given me a

21   lie.

22   Q. His obligation was not to commit crimes, right?

23   A. That is correct.

24   Q. If he commits a crime, that is a violation of his

25   contract, right?

MONIS - CROSS

1      A. If the DA deems it, absolutely.

2      Q. Well, it's a violation of his contract, the consequences

3      would vary, but it's a violation of the contract?

4      A. Sure.

5      Q. Okay.  Are you familiar with the phrase a lie of

6      omission?

7      A. I agree with you on that.

8      Q. So you can lie by not telling the whole truth, right?

9      A. Sure.

10     Q. He didn't tell you the whole truth, right?

11     A. And -- you've got to ask -- I don't understand where you

12     are trying to go with it, so --

13     Q. He didn't tell you he was committing crimes on the side,

14     which was a direct violation of his contract with the

15     Riverside County DA's Office; therefore, he didn't tell you

16     the whole truth, right?

17     A. I don't know if he was committing crimes on the side.

18     I've got to assume that he was, because he eventually got

19     arrested, and he was prosecuted for his roles as committing

20     crimes on the side.  When he started to do that, how he

21     started to do that, I was not aware.

22     Q. So here you have an informant who is not providing you

23     with all the information to make sure he's complying with the

24     contract, right?

25     A. I've got to assume that he was providing me accurate

MONIS - CROSS

1      information when I asked him.

2       Q. How many informants over the course of your career,

3      approximately, have you been the handler for?

4       A. Hundreds.

5       Q. Some you trust more than others, right?

6       A. Sure.

7       Q. Some are not high risk, others are, right?

8       A. Well, pretty much all of them are high risk, because all

9      of them seem to me to end up getting themselves in trouble

10      one way or another.  That is why they are informants.

11      Q. Did you ever tell any of your informants that it's

12      important that if they mess up or do something wrong, they

13      need to tell you right away?

14      A. Oh, I tell them that all the time.  Do I think that they

15      are going to do it?  No.

16      Q. Well, regardless of whether you think they are going to

17      do it, you tell them to do it, right?

18      A. Yeah.

19      Q. When they don't tell you, they are effectively lying to

20      you, right?

21      A. But how do I know if they did something wrong?  You are

22      expecting me to read their minds.  I don't know.

23      Q. No, I understand at the moment, but when you later find

24      out they have done something and they didn't tell you?

25      A. Then we deal with it.

MONIS - CROSS

1    Q. Because they lied to you, right?

2    A. Then we'll deal with it.

3    Q. Back to the 14th.  I just want to be clear, CI-6 was

4    present, right?

5    A. She was in the car during -- she never got out of the

6    car.  She was in the car.  She remained in the car the entire

7    time during the operation.

8    Q. Never went into any residence?

9    A. That's correct.

10   Q. To your knowledge she never had any interaction with

11   Mr. Gomez, right?

12   A. She did not.

13   Q. And Stranger was not present at the February Whitewater

14   rest stop transaction, right?

15   A. Who?

16   Q. Stranger?

17   A. No.

18   Q. At any -- well, I think you've already answered that, so

19   never mind.

20          Now, January 7th wasn't the first time that Stranger

21   was interacting with Mr. Gomez, right?

22   A. There was an initial meeting where Gomez and Lopez met

23   each other face-to-face for the first time in December of

24   2015.

25   Q. Right.  And they met face-to-face, but they had at least

MONIS - CROSS

1    one phone call, right?

2     A. As far as I know.  I'm sure that they had more, but at

3    least one phone call that I'm aware of, because we recorded

4    it.

5     Q. I'm sorry, who recorded it?

6     A. Stranger.

7     Q. Was that pursuant to a directive by you or ATF, to your

8    knowledge?

9     A. I don't remember if it came from myself or Jesse Woolley,

10   but he recorded the phone conversation which led to them

11   meeting at a taco shop the following day in North Indio.

12    Q. That was really the introduction meeting for Stranger and

13   Gomez, right?

14    A. That is the first time that they got to go face-to-face

15   with each other, other than knowing each other strictly by

16   reputation and name on the streets.

17    Q. And were you listening live to the audio?

18    A. No, he -- he recorded it himself that day, and then he

19   provided that audio when we met him the following day.

20    Q. He has his own --

21    A. Apparently.

22    Q. -- surveillance?

23    A. There was an app on his phone and he recorded the actual

24   phone conversation between the two through an app on his

25   phone.

MONIS - CROSS

1    Q. Okay.  And you listened to that, right?

2    A. Yeah.  He gave us the audio.  We have the audio.

3    Q. And he's kind of talking himself up to Mr. Gomez, right?

4    A. Oh, yeah.

5    Q. Presenting all this that he's a big shot on the streets,

6    right?

7    A. Totally what we would expect when gangsters meet for the

8    first time, building up their resume.

9    Q. So he's putting on an act, right?

10   A. He could be.

11   Q. Well, in the sense of he's trying to gain -- he's trying

12   to gain Mr. Gomez's confidence in trying to get him to --

13   A. You are talking about Stranger building his reputation

14   with Gomez?

15   Q. Stranger building Stranger's reputation up?

16   A. Absolutely, 100 percent.

17   Q. That is how to get him to transact with him, right?

18   A. Sure, yeah.

19   Q. Your experience, investigated gangs before, right?

20   A. Many times.

21   Q. And you've investigated just, let's call them common

22   street thugs that are not gang related right?

23   A. Yes.

24   Q. And it's not common for one person to go to another

25   person who they don't know and just straight up talk about

1    doing a criminal act together, right?

2     A. Um, no, you would be surprised, because what they are

3    doing is building themselves up for street credibility and

4    reputation on the streets.

5     Q. That is what I mean.  They don't just come up to someone

6    they don't know just based on reputation and say, Hey, let's

7    do this drug deal together, right?

8     A. Sure.

9     Q. They build each other up and get some confidence and

10   comfort with each other, right?

11    A. They are trying to build trust between each other.

12    Q. And there is a little one-upmanship going on, right? I'm

13   bigger than you?

14    A. There is, probably out of that conversation, probably

15   30 percent of it was true.

16    Q. He talks about how much money he has, right?

17    A. Right.

18    Q. Who he's connected with, right?

19    A. Right.

20    Q. And what a really bad gangster he is, right?

21    A. Correct.

22    Q. And what he can do to people, right?

23    A. Right.

24    Q. We took a look at Government's Exhibit 15, which I think

25   is already in evidence.  This was the -- I think you

MONIS - CROSS

1    testified this was a photo that Stranger took of his phone,

2    right?

3    A. No, that is Stranger's phone.  I believe Woolley took a

4    picture of his.

5    Q. Oh, I see, yeah.  There is someone's thumb on the right

6    there?

7    A. Yeah.

8    Q. So someone took a picture?

9    A. Of the phone, right.

10   Q. I think you testified Stranger told you this is a text

11   communication between Mr. Gomez and Stranger, right?

12   A. That is how I understood it.

13   Q. Yeah.  You didn't check the phone records for this

14   particular text, right?

15   A. I don't recall if I did or didn't.

16   Q. So as you sit here today, you don't actually know if this

17   is truly an exchange between Mr. Gomez and Stranger, right?

18   A. I'm not 100 percent.  The phone number is there and we do

19   have his phone numbers.  I would just have to look on the

20   phone records to see if that number correlated to -- because

21   you see Spank 144 and then the phone number is written below

22   it.

23   Q. I see a number 1 (442) 400-0446.  Is that --

24   A. And I do know that he had a 442 number.

25   Q. Okay.  So you think that that is -- that might be

MONIS - CROSS

1  Mr. Gomez's number, but as you sit here today you are not

2  sure?

3  A. I'm not sure, no.

4  Q. Okay.  Back in December, you actually met with Stranger

5  prior to his contact with Mr. Gomez on the 17th, right?

6  A. Yeah.  We met with him because we gave him the recording

7  equipment.

8  Q. No, in December, before the phone conversation.

9  A. I met with him -- because we had other criminal

10  investigations going on separate of Mr. Gomez, so I probably

11  met with Lopez probably five, six, seven times prior to that

12  date.  So I specifically -- I don't know.

13  Q. And my question was bad.  I meant you met with him prior

14  to the phone conversation with Mr. Gomez in connection with

15  the investigation into Gomez?

16  A. I would assume so.

17          MR. KALOYANIDES: One moment, Your Honor.

18          (Pause in proceedings.)

19          MR. KALOYANIDES: Your Honor, other than moving 301,

20  302, and I think it's 305 into evidence, I have no further

21  questions.

22          THE COURT:  Any objection?

23          MR. PETERSON: I'm sorry, 301, 302 and 305?

24          MR. KALOYANIDES: Yeah, 301, 302, 305.

25          THE CLERK:  311?

MONIS - CROSS

1            MR. KALOYANIDES: No, not 311.

2            THE CLERK:  What about 309?

3            MR. KALOYANIDES: And 309, yes -- oh, wait.  Not 309.

4            MR. PETERSON: No objection, Your Honor.  I would

5    just say for the record that 301 and 302 are by stipulation,

6    and I believe the other one is by foundation with the

7    witness.

8            MR. KALOYANIDES: Thank you.

9            THE COURT:  Okay.  They will be received.

10           (Thereupon, Exhibit Numbers 301, 302 and 305 were

11   received in evidence.)

12           THE COURT: Redirect?

13                      REDIRECT-EXAMINATION

14   BY MR. PETERSON:

15    Q. Just a few questions, Investigator Monis.

16           Earlier Mr. Kaloyanides asked you questions about

17   how it is that Defendant Gomez had come to your attention.

18   Did you hear about Defendant Gomez from more than one source?

19    A. Yes.

20    Q. Was one source Confidential Informant Number 5?

21    A. One of them.

22    Q. Was another source Parole Agent Ortiz?

23    A. One of them.

24    Q. Do you recall that there were additional sources beyond

25   that?

1    A. Because of the course of what I do, I mean, I hear about

2    gang members all the time, and guys potentially being, you

3    know, up the food chain, if you will, because of what I do.

4    So I hear this information all the time.

5         Now, grand jury I testified that I got the

6    information from CI-5, which is true and correct, but unless

7    there was additional questions to follow up, was there any

8    other information, I just went with the first thing that came

9    to my head.  But yeah, it wasn't just one person and being

10   CI-5 that said go after this guy.

11   Q. And I believe you might have covered what I'm about to

12   ask you about with Mr. Kaloyanides, but I want to make sure

13   of it.

14        CI-5 worked on investigations regarding additional

15   suspects, that is to say, not only Defendant Gomez, and not

16   only Angel Carmona, and not only Steven Andrew Gonzalez, but

17   also other people who were suspected of being involved in

18   criminal activity; is that correct?

19   A. We did an entire operation in Desert Hot Springs called

20   Desert Impact where we took down multiple locations of

21   multiple suspects in Desert Hot Springs because of CI-5 and

22   his involvement in that case.  He was -- Gomez was just one

23   of multiple, multiple, multiple defendants.

24   Q. And Mr. Kaloyanides also asked you some questions about

25   your level of knowledge or recollection of information

MONIS - REDIRECT

1    regarding to whether or not Defendant Gomez was involved in

2    criminal activity near the time that you began to investigate

3    him.  I believe you said around that time that you had

4    information that he was involved with a criminal street gang

5    known as North Side Indio; is that correct?

6     A. That was the criminal street gang that he was affiliated

7    with.  The information that I had is that not only was he a

8    member of North Side Indio, but he was making a power play

9    under the umbrella of the Mexican Mafia for control of the

10   streets within the Coachella Valley.

11    Q. And based on your experience as an investigator, and in

12   particular, one who has investigated conduct involving both

13   North Side Indio and Mexican Mafia activity, is it your

14   understanding that those entities or organizations are

15   involved in drug trafficking?

16    A. Yes.

17    Q. Is it your understanding that they are involved in

18   handling firearms?

19    A. Yes.

20         MR. PETERSON: Your Honor, I have no further

21   questions on redirect.

22         THE COURT:  Any recross?

23         MR. KALOYANIDES: Very brief, Your Honor.

24                   RECROSS-EXAMINATION

25   BY MR. KALOYANIDES:

MONIS - RECROSS

1    Q. Investigator Monis, you've testified that there were

2    now -- you've testified there were multiple sources or

3    multiple reasons why you started looking at Mr. Gomez.  When

4    you were asked the question before the grand jury, how did

5    you become familiar with Mr. Gomez, you said through

6    Stranger, right?

7    A. You are correct.

8    Q. You didn't say, I also had this other information from

9    his parole officer, right?

10   A. You are correct.

11   Q. You didn't say, Look, I do this all the time and I was

12   familiar with him, right?

13   A. You are correct.

14         MR. KALOYANIDES: Nothing further, Your Honor.

15         THE COURT:  May this witness step down?

16         MR. PETERSON: Your Honor, no further questions for

17   this witness.  We may wish to recall in rebuttal.

18         THE COURT:  You may step down, sir.  Thank you.

19         THE COURT:  Sheila tells me we are going to break in

20   five minutes, so let's break now.  Ten minutes, ladies and

21   gentlemen.  Remember the admonition, please.

22         (Thereupon, the jury retired from the courtroom.)

23         (Thereupon, there was a brief recess.)

24         (Thereupon, the jury returned to the courtroom.)

25         THE COURT:  All right.  Once again we have been

MONIS - RECROSS

1    joined by the jury, all counsel are present, as is the

2    defendant.  Your next witness, please?

3              MR. PETERSON: Your Honor, the government calls

4    CI-489.

5              THE CLERK:  Step right here.

6    THEREUPON:

7                          CI-489,

8    Called in these proceedings and after having been first duly

9    sworn testifies as follows:

10             THE CLERK:  Please be seated.

11             THE COURT:  All right.  Mr. Peterson.

12             MR. PETERSON: Thank you, Your Honor.

13                     DIRECT EXAMINATION

14   BY MR. PETERSON:

15   Q. Good afternoon.

16   A. Good afternoon.

17   Q. May I call you Gabe?

18   A. Yes.

19   Q. And is Gabe a name that you've also used in work that

20   you've done as a confidential informant?

21   A. Yes, sir.

22   Q. Now, how you earn your living?

23   A. Basically earn my living working as a confidential

24   informant with the Bureau of Alcohol, Tobacco and Firearms,

25   Federal Bureau of Investigation, Drug Enforcement

CI-489 - DIRECT

1    Administration, and numerous local law enforcement agencies

2    through about eight or nine different states.

3    Q. So you get paid to work as a confidential informant; is

4    that right?

5    A. Correct.

6    Q. And based on what you just said, it sounds like you've

7    worked with a number of different federal investigatory

8    agencies; is that right?

9    A. Yes.

10   Q. Have you also worked with local law enforcement agencies?

11   A. Yes, I have.

12   Q. And how did you -- actually, let me take that question

13   back.

14          How do you get paid?

15   A. Through ATF, I get paid on basically a daily basis, I get

16   $200 a day, not to exceed $1,400 in a seven-day period.

17   Q. And approximately how long have you worked as a

18   confidential informant?

19   A. Started working as a confidential informant in 2001.

20   Q. And at that time in 2001, when you first started as a

21   confidential informant, were you paid at that time?

22   A. When I first began? No, I wasn't.

23   Q. What were the circumstances surrounding how you became a

24   confidential informant?

25   A. I was presented with an opportunity by the Drug

CI-489 - DIRECT

1    Enforcement Administration to basically work charges off.  I

2    had been arrested for the delivery of a pound of

3    methamphetamines, and they asked me to -- if I would be

4    willing to work for them.

5     Q. And so after that -- so let me again ask you a background

6    question.  It's your understanding that they had investigated

7    you for being involved in the distribution of

8    methamphetamine; is that right?

9     A. Yes, sir.

10     Q. And then after you were arrested, you then began to work

11    as a confidential informant with the DEA; is that right?

12     A. Yes, sir.

13     Q. And in what part of the country did that take place?

14     A. That took place in Tucson, Arizona.

15     Q. And are you familiar with the phrase working off a case?

16     A. Yes.

17     Q. What does that phrase mean to you?

18     A. It means you -- like in this case, for instance, DEA had

19    charges, it was a conspiracy to sell 10 pounds of

20    methamphetamine with a delivery of one, so I basically worked

21    those charges off, so they wouldn't file them in court.

22     Q. So eventually you were not -- you were not actually

23    charged or convicted of the conduct that led to your arrest;

24    is that right?

25     A. That is correct.

CI-489 - DIRECT

1    Q. Now, when you first began to be -- I'm sorry.  When you

2    first started to work as a confidential informant with the

3    DEA, were -- did you use drugs at that time personally?

4    A. Yes.

5    Q. What drug did you use?

6    A. My drug of choice was powder cocaine and crack.

7    Q. Did a time come when you stopped using drugs?

8    A. Yes.

9    Q. Approximately when was that?

10   A. 2011.

11   Q. Did that correspond with a physical change in your

12   circumstances? Did you move from one area of the country to

13   another?

14   A. Yes, I did.  I just basically woke up one day, and I was

15   tired of it.  So I got up and moved from Arizona to New

16   Mexico.

17   Q. Now, are you working essentially full-time as a

18   confidential informant?

19   A. Yes, sir.

20   Q. You don't have another form of -- another way in which

21   you earn money?

22   A. No.

23   Q. Approximately when did you start to work as a full-time

24   informant?

25   A. Full-time informant, I started probably around 2012,

CI-489 - DIRECT

1    2013.

2     Q. To the best of your recollection, approximately how much

3    money have you earned as a confidential informant?

4     A. The last time I checked, I think it was about almost

5    400,000.

6     Q. And that is across years of work as a confidential

7    informant; is that right?

8     A. That is starting from as soon as I finished working my

9    charges off through DEA up until present day.

10    Q. But for clarity, when you -- yeah, you said after you

11    worked off your earlier charges?

12    A. Correct.

13    Q. Okay.  Now, I would like to ask you about the time period

14    of late 2015 through early to mid-2016.  During that time

15    period did you work as a confidential informant for ATF?

16    A. Yes.

17    Q. And in that capacity, did you work in Riverside County?

18    A. Yes.

19    Q. In addition to ATF -- well, let me ask you a different

20    question.

21          Was there a law enforcement officer that you

22    principally worked with while you were doing your work in

23    Riverside County in 2015 and 2016?

24    A. There were two officers that I worked with, yes.

25    Q. Who are those officers?

CI-489 - DIRECT

1       A. Special Agent Jes Woolley from Alcohol, Tobacco, Firearms

2       and Explosives, and Detective Monis here.

3       Q. You see Detective Monis sitting at counsel's table?

4       A. Yes.

5       Q. Now, as part of your work during 2015 and 2016 in

6       Riverside County, were you involved in an investigation of

7       Julio Cesar Gomez, also known as "Spanky"?

8       A. Yes, I was.

9       Q. Were you involved in an investigation of Steven Andrew

10      Gonzalez, also known as "Cubs"?

11      A. Yes, I was.

12      Q. And were you involved in an investigation of Angel

13      Carmona?

14      A. Yes.

15      Q. During that investigation, did you actually meet with

16      Defendant Gomez?

17      A. Yes.

18      Q. Did you meet with Steven Andrew Gonzalez?

19      A. Yes.

20      Q. And did you meet with Angel Carmona?

21      A. Yes.

22      Q. Did you know any of those three individuals prior to your

23      work in Riverside County in late 2015 or early to mid-2016?

24      A. No, I did not.

25      Q. Do you see Defendant Gomez in the courtroom today?

CI-489 - DIRECT

1    A. Yes.

2    Q. Can you indicate where he's located, either based on his

3    location or an item of clothing that he's wearing?

4    A. Sitting to my right with black tie and white shirt,

5    glasses.

6         THE COURT:  He's identified the defendant.

7    Q. Now, how did you come to meet Defendant Gomez, Angel

8    Carmona and Steven Andrew Gonzalez?

9    A. I was introduced to the defendant sitting in front of me

10   by another informant, Andy, also by CI-5.

11   Q. So you worked with another informant at one point in time

12   who you knew as Andy or CI-5; is that right?

13   A. Yes.

14   Q. And how did you meet CI-5?

15   A. CI-5 was introduced to me through Detective Monis and

16   Special Agent Woolley.

17   Q. And was it part of the law enforcement plan as you

18   understood it for CI-5 to introduce you to Defendant Gomez?

19   A. Correct.

20   Q. What did you understand your role to be in the

21   investigation?

22   A. My role in the investigation would be once CI-5, Andy,

23   after he introduced me, was to make purchases of firearms

24   and/or any type of narcotic.

25   Q. Did you see yourself as a middleman?

CI-489 - DIRECT

1    A. Basically, yes.

2    Q. And how were you to describe the role that you would play

3    in your undercover capacity?

4    A. Basically, my backstory was is that I was a person that

5    was -- excuse me -- that I was a person that was purchasing

6    firearms, that I was selling them to the cartel in Mexico,

7    and then I was moving narcotics into Albuquerque, New Mexico,

8    Denver, Colorado, and Chicago, Illinois.

9    Q. And that -- that was information that you would share

10   with suspects of investigations when you would meet with

11   them; is that right?

12   A. Yes.

13   Q. And that was how you explained to them what you were

14   looking to do; is that right?

15   A. Correct.

16   Q. Now, approximately when did you first meet Defendant

17   Gomez and Angel Carmona?

18   A. I don't remember the exact date.  I know it was 2016.  I

19   don't remember -- early, in the beginning of the year.  I

20   don't remember the exact date.

21   Q. Okay.  Do you recall where that meeting took place?

22   A. Yes, it took -- it took place in a -- at a taqueria shop.

23   Q. And was that in the -- in the desert area east of Los

24   Angeles?

25   A. I'm -- yes, it was.  I call it Indio, because it's the

CI-489 - DIRECT

1    only city I can remember when I go through there.

2     Q. Okay.  But there is a number of cities nearby each other

3    in the Indio area; is that right?

4     A. Yes.  Yes, sir.

5     Q. And it might have been in one of the neighboring towns?

6     A. Yes, sir.

7     Q. Okay.  But you do recall meeting with Defendant Gomez and

8    Angel Carmona at a taqueria in that area; is that right?

9     A. Yes, sir.

10    Q. Now, how did you get to that meeting?

11    A. That meeting I was -- I rode in the vehicle with CI-5,

12   Andy.

13    Q. And before you got to that meeting at the restaurant, did

14   you have a previous meeting with Investigator Monis and Agent

15   Woolley?

16    A. Yes.

17    Q. What happened at that meeting that happened before the

18   meeting with Defendant Gomez and Angel Carmona at the

19   restaurant?

20    A. So basically at that meeting, I was given the information

21   on what was going on, why we were going to that meeting, and

22   at that same time we were both, um, our vehicle was checked.

23   We were checked, and we were given recording equipment.

24    Q. And is it your -- is it your understanding that the

25   recording equipment recorded both audio and video?

CI-489 - DIRECT

1    A. Yes.

2    Q. And were you also provided buy money for a potential

3    transaction if one were to take place?

4    A. Yes.

5    Q. And do you know if any kind of GPS tracking device was

6    put in the vehicle that was used by the confidential

7    informants?

8    A. Yes.

9    Q. So is it right that after that planning meeting, that you

10   then drove or traveled in a vehicle, I should say, with CI-5

11   to the restaurant where you were to meet with Defendant Gomez

12   and Angel Carmona; is that right?

13   A. Correct.

14   Q. And do you recall if other people were there at that

15   meeting as well?

16   A. There was another person at that meeting, but I don't

17   remember who he was.

18   Q. Now, just in summary form at this point, and the future,

19   I would like to ask you more detailed questions.  In summary

20   form, what happened at the meeting?

21   A. On the way to that meeting, as I was speaking with Andy,

22   CI-5, he basically was saying that he was going to meet up

23   with some of his associates, they were going to talk about

24   business.  And I told him that was fine, just to go ahead.

25   And it was to be an introduction of myself into his

CI-489 - DIRECT

1    associates.

2     Q. Now, right now I heard you use the word business and

3    associates.  What did you understand the business to be?

4     A. Basically, the business was to be is that Andy used to

5    collect taxes for the Mexican Mafia and apparently that --

6              MR. KALOYANIDES: Objection, lacks foundation.

7              THE COURT:  Overruled.

8              THE WITNESS:  Apparently that -- that the defendant

9    was going to take over what Andy was doing.

10    Q. You understood that based on a conversation that you had

11   with Andy?

12    A. Correct.

13             MR. KALOYANIDES: Objection, hearsay, move to strike.

14             THE COURT:  Overruled.

15    Q. Once you got to the restaurant, again in summary form

16   right now, what happened there?

17    A. Andy made the introduction to everybody that was there.

18   And me doing work in this type of work previously, and

19   knowing what their meeting was about, I had told my -- I had

20   told him, I said, You guys go ahead and take care of your

21   business, I'll sit at this other table while you guys do

22   your -- handle your business and your meeting and stuff.  The

23   defendant then instructed me, he goes, If you are a friend of

24   his, you can sit here at the table, and you can just sit here

25   with us.

CI-489 - DIRECT

1    Q. Okay.  So at that point you sat down at the table with

2    CI-5, Defendant Gomez, Angel Carmona, and at least one other

3    individual?

4    A. Yes.

5    Q. What did you -- in summary form right now, what did you

6    end up discussing with them at that meeting?

7    A. I didn't -- I just let them talk, but basically a few

8    minutes later, after a while, we were drinking and eating

9    chips and stuff, we, the defendant and I, I asked him a

10   question if he was raised in the area or from the area.  And

11   then we struck up a conversation.  And I basically told him

12   what I was about.

13   Q. And when you say what you were about, are you referring

14   to the backstory that you described earlier?

15   A. Yes, sir.

16   Q. That you were interested in purchasing methamphetamine

17   and firearms so that you could then transport them elsewhere

18   and sell them at a profit?

19   A. Yes.

20   Q. Now, do you have an understanding as to whether or not

21   your interaction with Defendant Gomez was recorded?

22   A. Yes.

23   Q. And have you actually reviewed the recording?

24   A. Yes.

25   Q. And do you know if -- I'm sorry.  And do you also know if

CI-489 - DIRECT

1     a transcript has been made of the recording?

2      A. Yes.

3      Q. And have you reviewed a copy of the transcript?

4      A. Yes.

5      Q. Do you believe that it's a reasonably accurate

6     transcription of the audio of the recording?

7      A. Yes.

8            MR. PETERSON: Your Honor, at this point I would like

9     to ask for the courtroom deputy to please put Exhibit 1 in

10    front of the witness.

11     Q. Do you recognize that?

12     A. Yes.

13     Q. What is it?

14     A. It's a disk.

15     Q. And do you know what is on that disk?

16     A. Yes.

17     Q. What is on the disk?

18     A. It's a recording of our meeting.

19     Q. And is it actually broken up into clips or segments?

20     A. Yes, it is.

21     Q. It's not the entire recording from beginning to end, but

22    just snippets of the recording; is that right?

23     A. Correct.

24     Q. And how do you recognize it?

25     A. My initials are on it.

CI-489 - DIRECT

1    Q. And you recall reviewing it previously?

2    A. Yes.

3    Q. Do you know if there is a copy of the recording that is

4    on the disk also on the government's laptop?

5    A. Yes, I do.

6    Q. And have you previously reviewed the recording on the

7    government's laptop?

8    A. Yes, I have.

9          MR. PETERSON: Your Honor, at this point, I would

10   like to move to publish the first segment of Exhibit 1.

11         MR. KALOYANIDES: No objection.

12         THE COURT:  Go ahead.

13         (Thereupon, the audio was played.)

14   Q. Did you just hear that section of the recording?

15   A. Yes.

16   Q. And did you see the transcript that has been synced with

17   the recording?

18   A. Yes.

19   Q. And is that the recording and the transcript that you

20   were describing earlier when I was asking you questions?

21   A. Yes, sir.

22   Q. At least part of it, right?

23   A. Right.

24   Q. So what happened there?

25   A. Basically CI-5, Andy, and the defendant were making

CI-489 - DIRECT

1    contact with each other, speaking to one another.

2     Q. Now I'm going to move to publish the second segment on

3    that exhibit.

4              (Thereupon, the audio was played.)

5     Q. Now, did you recognize your voice in that segment of the

6    recording?

7     A. Yes.

8     Q. And did you recognize Defendant Gomez's voice as well?

9     A. Yes.

10    Q. Now, was this kind of the point where you were striking

11   up conversation with him, like you had mentioned earlier in

12   your testimony?

13    A. Yes, it was.

14    Q. Now, did you hear him say that he had just finished doing

15   14 years?

16    A. Yes.

17    Q. What did you understand by that?

18    A. That he had just done 14 years in prison.

19    Q. And did he describe where he had done it to you?

20    A. He did.  In the state.

21    Q. You understood that he had spent 14 years in state

22   custody?

23    A. Yes.

24    Q. Based on what he said?

25    A. Yes.

CI-489 - DIRECT

1    Q. We are going to move now to the third segment from

2    Exhibit 1.

3              (Thereupon, the audio was played.)

4    Q. So in addition to Defendant Gomez's voice, did you also

5    recognize Angel Carmona's voice on that recording?

6    A. Yes.

7    Q. Was there a point in that segment where Angel said

8    something to the effect of, "Cuz, I got what I could go pick

9    up right now"?

10   A. Correct.

11   Q. And then did Defendant Gomez respond, "No, I got it"?

12   A. Yes.

13   Q. And then he said, "Oh, that, that"?

14   A. Yes.

15   Q. What did you understand by that interaction?

16   A. That me and the defendant were talking about a quarter

17   pound of methamphetamine that I was trying to buy and Angel

18   was talking about a pistol that he had at a different

19   location.

20   Q. And so did you also understand that at a certain point,

21   that the defendant thought that Angel was saying, "I got the

22   methamphetamine, too"?

23   A. Correct.

24   Q. But then Angel gave him some kind of signal or

25   communication to clarify, "No, he's just talking about the

CI-489 - DIRECT

1       firearm"?

2        A. Right.

3        Q. Okay.  Did Angel also mention a little snub?

4        A. Yes.

5        Q. What did you understand by that?

6        A. As a -- that he had a pistol, a snub-nosed pistol.

7        Q. And did Angel say the ticket was like four and a half,

8       five?

9        A. Yes.

10       Q. What did you understand by that?

11       A. It's just a slang word, 450 to $500 for it.

12       Q. And I believe at the earlier part of the recording, you

13      suggested doing something next week.  What was it that you

14      were suggesting you do next week?

15       A. Basically, we were already there at the taqueria when we

16      were talking about this, and they didn't have the stuff that

17      I wanted with -- on them.  And it would take them at least

18      45 minutes to an hour to go pick it up and come back.  So I

19      just in return told them, Well, let's get it all together and

20      we'll do it next week when I come through.

21       Q. So we are going to go ahead now and publish the next

22      segment on the first recording.

23              (Thereupon, the audio was played.)

24       Q. In that segment was there a reference to a person that

25      Defendant Gomez described as Homie, Cubs?

CI-489 - DIRECT

1    A. Yes.

2    Q. Now, at that point in time did you know Cubs?

3    A. No, I did not.

4    Q. Did you eventually meet Cubs?

5    A. Yes, I did.

6    Q. And did you meet him the following week?

7    A. Yes.

8    Q. Did you hear Defendant Gomez reference a pump action?

9    A. Yes.

10   Q. What did you understand by that?

11   A. Normally, a pump action is a shotgun.

12   Q. And did you hear him say, "We are just trying to get rid

13   of it, too"?

14   A. Yes.

15   Q. What did you understand by that?

16   A. That he would be -- if they still had it, he would be

17   willing to sell it.

18   Q. We are going to move on now to the next segment on

19   Exhibit 1.

20           (Thereupon, the audio was played.)

21   Q. Now, I would like to ask you about a few words that were

22   used there.  What did you understand by the word toys in this

23   context?

24   A. Toys is referred to on the street as, you know, it's

25   another word for guns.

1    Q. And ticket number?

2    A. Ticket number is the price of the total, whatever we are

3    purchasing.

4    Q. And in the context of this conversation, the phrase other

5    stuff?

6    A. Other stuff was used is -- I used other stuff because we

7    are in a public area, um, a public restaurant.  Other stuff

8    meant methamphetamines.

9    Q. And did you have an understanding as to whether or not

10   Defendant Gomez was ready and willing to provide

11   methamphetamine that day?

12   A. He was willing to provide it that day.  The only thing

13   was is that he had to go to Indio to pick it up.  But as

14   earlier stated, I was headed -- I was headed up north to

15   Northern California, so I couldn't wait the extra hour.

16   Q. So you -- so you arranged to meet with him the following

17   week, is that --

18   A. Correct.

19   Q. Now, at a certain point in time you left the restaurant,

20   right?

21   A. Yes.

22   Q. And did you leave the restaurant with CI-5?

23   A. Yes.

24   Q. What happened after you and CI-5 left the restaurant?

25   A. CI-5 and I left the restaurant and we headed to the

CI-489 - DIRECT

1    designated meeting spot that was set up prior to us going to

2    the meeting that Special Agent Woolley and Detective Monis

3    had set.

4    Q. And once you got to that meeting spot, did you, in fact,

5    meet with Mr. Monis and Mr. Woolley?

6    A. Yes, we did.

7    Q. And what happened once you met with them?

8    A. At that point, they searched us again.  They searched the

9    vehicle and they took repossession of the recording

10   equipment.  And we did a debrief on -- basically did a quick

11   talk on what happened inside the restaurant.

12   Q. And did you provide buy money, any buy money that you

13   had?

14   A. Yes, I returned the money back.  Whatever wasn't spent on

15   food, I returned back to them.

16   Q. Now, so at that meeting in the restaurant, you spoke with

17   Defendant Gomez and Angel Carmona about meeting the following

18   week for firearms and methamphetamine transaction; is that

19   right?

20   A. Correct.

21   Q. Did that meeting actually happen the following week?

22   A. Yes, it did.

23   Q. Now, before that meeting occurred, did you also have --

24   did you participate in a planning meeting that day, as well?

25   A. Yes.

CI-489 - DIRECT

1    Q. Now, what happened at that planning meeting?

2    A. Basically, we were searched again, the vehicle was

3    searched again, given recording equipment.  We talked about I

4    was given the buy money on what we, you know, the exact

5    amount of what we were going to buy, and we went our way.

6    Q. Now, CI-5 was at that meeting; is that right?

7    A. Correct.

8    Q. Law enforcement agents or officers were at that meeting;

9    is that right?

10   A. Yes.

11   Q. Was another confidential informant also at that meeting?

12   A. Yes.

13   Q. Did you understand that confidential informant to be the

14   partner of CI-5?

15   A. Yes, I did.

16   Q. I mean romantic or wife or something like that?

17   A. Yes.

18   Q. Okay.  Now, after you and CI-5 were equipped with

19   recording devices and provided with the buy money, what then

20   happened, you know, from the end of the planning meeting

21   going forward?

22   A. CI-5, CI-6 and I drove to the meet -- the meet spot that

23   was coordinated through the defendant and CI-5 and myself.

24   Q. Okay.  Now, while you were riding in the vehicle with

25   CI-5 and CI-6, is it your understanding that CI-5 placed a

CI-489 - DIRECT

1    phone call to Defendant Gomez?

2     A. Yes.

3     Q. I would like to ask you to turn your attention now to

4    what's been marked for identification purposes only as

5    Government's Exhibit 2.

6         MR. PETERSON: And Ms. English, if I could ask you to

7    do me a favor, please, of providing Exhibit 2.

8         THE WITNESS:  Thank you.

9     Q. Do you recognize that?

10    A. Yes.

11    Q. What is it?

12    A. It's another disk.

13    Q. And do you know what is on that disk?

14    A. It's going to be a recording of various phone calls.

15    Q. Is it -- does it actually cover the meetings that, not

16    the meetings, the -- I'm sorry.  Let me take a step back.

17         You and CI-5 were wearing recording devices

18    throughout the meeting that you were to have with Defendant

19    Gomez and Angel Carmona and Steven Gonzalez; is that right?

20    A. Correct.

21    Q. And you've actually reviewed the recordings that were

22    made; is that right?

23    A. Yes, I have.

24    Q. And you've also reviewed a transcript that was made of

25    that recording; is that right?

CI-489 - DIRECT

1    A. Yes.

2    Q. And do you believe that transcript to be a reasonably

3    accurate reflection of the recording?

4    A. Yes.

5    Q. Is it your understanding that the recording was broken

6    into clips and placed on a disk?

7    A. Yes.

8    Q. Is it also your understanding that that disk is currently

9    in front of you and identified as Exhibit 2?

10   A. Yes.

11   Q. Do you also understand that that same, the same clips of

12   the recording are also on the government's laptop, which is

13   here in the courtroom?

14   A. Yes.

15          MR. PETERSON: So at this point, Your Honor, I would

16   like to move ahead and publish the first segment from

17   Exhibit 2.

18          THE COURT:  All right.  Go ahead.

19          MR. KALOYANIDES: No objection.

20          (Thereupon, the audio was played.)

21   Q. Now, you didn't hear your voice on that recording, did

22   you?

23   A. No, I didn't.  There was no need for me to speak.  They

24   were on the phone with each other.

25   Q. You were present when that call was made, right?

CI-489 - DIRECT

1    A. Correct.

2    Q. And you were in the vehicle with CI-5, right?

3    A. CI-5 and CI-6 at the time.

4    Q. And it was your understanding that the vehicle was

5    heading to the ultimate meeting location; is that right?

6    A. Yes.

7    Q. And is it your understanding that during that phone call,

8    that Defendant Gomez provided a phone number for Cubs to

9    CI-5?

10   A. That is correct.

11   Q. Based on that, was it your understanding that at that

12   point Defendant Gomez did not have Cubs' phone number?

13   A. Repeat that question, please?

14   Q. Do you know if -- I'm sorry, I think I misspoke,

15   actually.  Do you know if CI-5 had Cubs' phone number prior

16   to being provided with the phone number on that call?

17   A. I do not know if he had it.  I know that the defendant

18   provided the phone number.

19   Q. Okay.  Now, eventually was the vehicle -- did the vehicle

20   that you rode in, did it eventually arrive at Cubs' house?

21   A. Yes.

22   Q. And did you meet with Cubs?

23   A. Yes.

24   Q. Where was he when you met with him?

25   A. Standing outside on basically the sidewalk.

CI-489 - DIRECT

1    Q. At this point we are going to move ahead with the second

2    segment from Exhibit 2.

3              (Thereupon, the audio was played.)

4    Q. Now, at the beginning of that clip, were you introduced

5    to Cubs?

6    A. Yes.

7    Q. And was it your understanding that CI-5 and Cubs were

8    talking about people they both knew?

9    A. Yes.

10   Q. Cheetah?

11   A. A person that they know.  I don't know who they were

12   talking about.

13   Q. Dopy?

14   A. Don't know him.

15   Q. Cubs' brother?

16   A. Never met him.

17   Q. King Busy?

18   A. Never met that person either.

19   Q. Hewe?

20   A. Don't know who he is.

21   Q. You don't know any of those people?

22   A. No.

23   Q. But based on your presence and participation in the

24   conversation, you understood that both of them know who --

25   A. Correct.

CI-489 - DIRECT

1    Q. -- those people were, right?

2    A. Yes.

3    Q. Now, near the end of that recording, was it your

4    understanding that CI-5 told Cubs that he was going to call

5    Spanks to talk about where to do the deal?

6    A. Yes.

7    Q. And what did you understand by "the deal"?

8    A. From what I understood earlier is we were supposed to

9    meet at Cubs' place to do the deal.  But according to when

10   CI-5 told -- told Cubs when he was going to call Spanks, that

11   Cubs had already called him and told him they were going to

12   do the deal at the same place.

13   Q. Your understanding was that Cubs and Spanky had previous

14   communication, right?

15   A. Correct.

16   Q. And you understand Spanks or Spanky to be Defendant

17   Gomez?

18   A. Yes.

19   Q. And "the deal", you understood that to be you purchasing

20   methamphetamine and a firearm; is that right?

21   A. Correct.

22   Q. Now, Defendant Gomez and Angel Carmona were not there

23   when you arrived, right?

24   A. No.

25   Q. You were just interacting with Cubs for a while?

1    A. Yes.

2    Q. Did you recall seeing anything happen while you were

3    waiting for Defendant Gomez and Angel Carmona to arrive?

4    A. Yes.

5    Q. What did you see?

6    A. There was another individual that came to see Cubs.  Then

7    those two individuals, Cubs and the unknown individual, did a

8    drug transaction.

9    Q. Now, how do you know that?

10   A. I've done a lot of drug transactions in my day before I

11   became a confidential informant, which is the way they were

12   acting.  There was money exchanged.

13   Q. Did they step off to the side?

14   A. Yes.

15   Q. You didn't step off to the side with them?

16   A. No, I did not.

17   Q. But you saw Cubs hand something to this other man?

18   A. Yes.

19   Q. And you saw the other man hand something towards Cubs?

20   A. Correct.

21   Q. You didn't see specifically what the things were that

22   changed hands?

23   A. No.

24   Q. We are going to move ahead and publish the third segment.

25            (Thereupon, the audio was played.)

CI-489 - DIRECT

1    Q. Now, after you saw that interaction between Cubs and the

2    man who approached him and then left, did you then overhear

3    this segment of the conversation that we have just heard

4    where CI-5 asked Cubs, "You got White China on you"?

5    A. Yes.

6    Q. And what did you understand by that?

7    A. On the street, one of the street terms for heroin is

8    called White China.

9    Q. And what did you understand Cubs to say in response?

10   A. Cubs said he didn't fuck with it.

11   Q. And that he didn't have it on him; is that right?

12   A. Correct.

13   Q. Now, did the -- one of the recording devices, was it a

14   watch camera or a video camera?

15   A. One of the devices -- yes, it was, it was a watch, and

16   the other was a belt.

17   Q. And did the one capturing video record partial video of

18   Cubs' profile as you were waiting for Defendant Gomez to

19   arrive?

20   A. Yes, it did.

21   Q. We are going to move ahead now with publishing the fourth

22   of six segments from Exhibit 2.

23            (Thereupon, the audio was played.)

24   Q. Do you recognize the person on that video?

25   A. Yes, I do.

CI-489 - DIRECT

1     Q. Who is that?

2     A. Cubs.

3     Q. I'm sorry, withdraw that.

4           Did Defendant Gomez and Angel Carmona eventually

5     arrive at the location where you were waiting?

6     A. Yes, they did.

7     Q. And what happened once they got there?

8     A. There was hellos exchanged, and then eventually we ended

9     up leaving the spot that we were at.

10    Q. So there is some small talk initially?

11    A. Correct.

12    Q. And then you said, "we ended up leaving".  And who is

13    "we"?

14    A. The defendant, Angel and Cubs left in one vehicle, and

15    CI-5 and CI-6 followed them to a different location.

16    Q. And did you travel with CI-5 and CI-6?

17    A. Yes.

18    Q. We are going to move ahead with publishing the fifth of

19    six segments now.

20           (Thereupon, the audio was played.)

21    Q. Is that a recording that captures the conversation when

22    you first met with Defendant Gomez and Angel Carmona on that

23    day?

24    A. Yes.  That's the -- that was the, um, conversation.  It

25    was small talk when they pulled up to Cubs' house.

CI-489 - DIRECT

1    Q. Now, at a certain point in that conversation, did you

2    hear Spanky say, "I got everything"?

3    A. Yes.

4    Q. And what did you understand "everything" to mean?

5    A. The methamphetamines and firearm.

6    Q. And did you also hear him say, "It's cool right there to

7    go pick everything up"?

8    A. Yes.

9    Q. And what did you understand by that?

10   A. That we were leaving the one location to head to a

11   different location.

12   Q. To actually do the methamphetamine and firearm

13   transaction?

14   A. Correct.

15   Q. And you said earlier that two cars were then used to go

16   to a second location; is that right?

17   A. Yes.

18   Q. Was that second location close to the first location?

19   A. It was within a couple of blocks.

20   Q. Now, what -- and was that second location a house?

21   A. Yes, it was.

22   Q. What happened once you got to the house?

23   A. Basically, we all exited the vehicles.  We were led

24   inside the house, sat in the living room for a few minutes,

25   then we made our way to a back bedroom.

CI-489 - DIRECT

1    Q. And what happened once you got to the back bedroom?

2    A. Back bedroom, um, present was myself, CI-5, the

3    defendant, Angel Carmona, and Cubs.  Cubs left the room right

4    away and returned with a package and handed it to the

5    defendant.

6    Q. Cubs handed a package to Defendant Gomez?

7    A. Correct.

8    Q. And what did Defendant Gomez do after he received that?

9    A. He proceeded to open the package and hand me the

10   methamphetamine.

11   Q. And did you receive anything from Angel Carmona?

12   A. Yes, I purchased that pistol that we talked about

13   earlier, that I purchased from him.

14   Q. You described on your meeting, the earlier meeting that

15   you said, he then provided you with a firearm that matched

16   the same description at the second meeting?

17   A. Yes.

18   Q. We are going to move ahead now with publishing the sixth

19   of six segments from Exhibit 2.

20            (Thereupon, the audio was played.)

21   Q. We just paused this segment.  Did you just see somebody

22   walking in a door?

23   A. Correct.

24   Q. And who was that person?

25   A. That person walking in the door was Cubs.

CI-489 - DIRECT

1   Q. And is that consistent with what you earlier described,

2   that Cubs had left to get something and then come back to the

3   room?

4   A. Yes.

5           MR. PETERSON: Let's proceed with the segment.

6           (Thereupon, the video was played.)

7   Q. That was a longer clip.  At the beginning, did Angel tell

8   you five?

9   A. Yes.

10  Q. What did you understand five to be?

11  A. He wanted $500 for the firearm that I had just purchased.

12  Q. And did you actually give him that?

13  A. Yes.

14  Q. And you received the firearm from him?

15  A. Yes.

16  Q. And then after Steven Gonzalez returned to the room, did

17  you hear Defendant Gomez say, "This is a quarter"?

18  A. Yes.

19  Q. And I'm sorry, I think you said, "This is a quarter," and

20  Defendant Gomez said, "Yeah"?

21  A. Correct.

22  Q. What did you understand by that interaction?

23  A. Basically, what I was ordering was I was ordering

24  4 ounces, a quarter pound of meth, which comes out to

25  4 ounces.

CI-489 - DIRECT

1    Q. Now, at some point in time you said, "I just wanted to

2    start somewhere where you guys will trust me, I can trust

3    you."  Is that right?

4    A. Yes.

5    Q. And why did you say that?

6    A. I mean, it's just rule of thumb on the street is you

7    don't sell -- if you don't know somebody, you are not going

8    to come out and start selling a big amount, you know, just

9    doesn't matter who you are.  You just start off small and you

10   work your -- basically you are working up -- you are working

11   your way up the ladder.

12   Q. And did Defendant Gomez say something to you along the

13   lines of, "Because we can do -- if you still got cash right

14   now, we can do more right now"?

15   A. Yes.

16   Q. And what did you understand by that?

17   A. That he had more methamphetamines for sale.

18   Q. And did you understand him to say, ask you how soon you

19   would want a whole one?

20   A. Yes.

21   Q. What did you understand by "whole one"?

22   A. A whole pound of methamphetamine.

23   Q. And at a certain point in time, did you ask Angel if you

24   needed to worry about the toy?

25   A. Correct.

CI-489 - DIRECT

1    Q. And did Angel respond, "It's clean, it's clean"?

2    A. Yes.

3    Q. What did you understand by that?

4    A. Basically, in my -- in my cover story that has been set

5    up with the investigators who are doing this, my cover story

6    is, is that I'm purchasing any type of firearm, but I don't

7    want to get caught with a firearm that has been stolen,

8    serial numbers scratched off, or if it's been used in a

9    shooting, a murder, a drive-by, I don't want to get caught

10   with it, so I'll get it transported a different way.

11   Q. And so when he said "it's clean," what specifically did

12   you understand by that?

13   A. I assume -- to my understanding by clean, I assumed that

14   it was none of those things that I just described, that it

15   was a clean gun.

16   Q. Okay.

17   A. It wasn't stolen.  It was bought, you know, legally.

18   Q. Now, and then near the end of the recording, did

19   Defendant Gomez say, "What if we lose contact"?

20   A. Yes.

21   Q. And did you provide him with your telephone number?

22   A. I provided him with the number, yes, I did.

23   Q. And did he also say, "I'll get you packet"?

24   A. Yes.

25   Q. What did you understand by "packet"?

CI-489 - DIRECT

1     A. Basically, I'm trying to just, you know, get me a package

2     of guns and methamphetamine, and let me know what you want

3     for it.

4          MR. PETERSON: Your Honor, may I approach the witness

5     with physical evidence?

6          THE COURT:  Sure.

7     Q. Do you see items with exhibit tags 31 and 32 attached to

8     them?

9     A. Yes.

10    Q. Do you recognize them?

11    A. Yes.

12    Q. What do you recognize as Exhibit 31?

13    A. Exhibit 31 is methamphetamine.

14    Q. Can you turn your attention to Exhibit 32.  Do you

15    recognize that?

16    A. Yes.

17    Q. What is that?

18    A. The firearm I purchased that evening at the same time I

19    purchased the methamphetamine.

20    Q. We are going to now publish Exhibit 12.  Do you recognize

21    Exhibit 12?

22    A. Yes.

23    Q. What is Exhibit 12?

24    A. It's a picture of Angel.

25    Q. And we are going to now publish Exhibit 13.  Do you

CI-489 - DIRECT

1   recognize Exhibit 13?

2    A. Yes.

3    Q. What is that?

4    A. The defendant.

5    Q. And we are now going to publish Exhibit 14.  Do you

6   recognize that?

7    A. Yes.

8    Q. What is that?

9    A. That is Cub.

10   Q. Now, those three images from Exhibits 12, 13 and 14,

11   where do they come from?

12   A. The recording device, the watch that I had on.

13   Q. During the meeting; is that right?

14   A. Yes.

15   Q. And you were at that meeting, right?

16   A. Correct.

17   Q. So you recognize that?

18   A. Yes, I do.

19        MR. PETERSON: Your Honor, at this point I move to

20   admit Exhibits 12, 13, 14, and also 1 and 2, to the extent

21   that they were not previously admitted.

22        MR. KALOYANIDES: No objection.

23        THE COURT:  Admitted.

24        (Thereupon, Exhibit Numbers 12-14 and 1-2 were

25   received in evidence.)

CI-489 - DIRECT

1          MR. PETERSON: Thank you.

2     Q. Now --

3          MR. PETERSON: Your Honor, a quick question.  I'm

4     about to move into a new subject area, shall I do so or would

5     the Court like to take a brief recess?

6          THE COURT:  We've got about 20 more minutes before

7     our next break.

8          MR. PETERSON: Okay.  Thank you.

9     Q. Now, at the end of your meeting where you purchased the

10    revolver and the approximately quarter pound of

11    methamphetamine, did you -- did you discuss having a

12    subsequent meeting with Defendant Gomez?

13    A. Yes, I did.

14    Q. And that was to purchase more methamphetamine and more

15    firearms; is that right?

16    A. Correct.

17    Q. Did you actually have a subsequent meeting with him?

18    A. Yes, I did.

19    Q. And approximately when did that take place?

20    A. Still within a couple of weeks of -- I don't remember the

21    exact day, but I know it was within a couple of weeks.

22    Sometime in February.

23    Q. Of 2016?

24    A. Yes, sir.

25    Q. Now, did you and Defendant Gomez communicate before that

1    meeting?

2     A. Yes.

3     Q. Did you exchange text messages?

4     A. Yes.

5     Q. Did you also exchange three phone calls?

6     A. Yes.

7     Q. I would like to ask you to turn your attention now to

8    Exhibit 22.  We'll publish 22.  Do you recognize Exhibit 22?

9     A. Yes.

10    Q. What is that?

11    A. Screenshot of my phone.

12    Q. And who are you communicating with in this screenshot?

13    A. Spanky.

14    Q. And is Spanky Defendant Gomez?

15    A. Yes.

16    Q. Now, in this screenshot of text messages, how do you

17   describe yourself?

18    A. As Gabe from New Mexico, Stranger's boy.

19    Q. And who is Stranger?

20    A. Stranger is Andy, CI-5.

21    Q. And what are you telling him that you are looking to do

22   in this communication?

23    A. Basically, I'm telling him that I'm coming through the

24   area, looking for -- I said half book.  Basically, it's a

25   half pound of methamphetamines, and toys, slang words for

CI-489 - DIRECT

1    methamphetamines and guns.

2      Q. And how did he respond to you?

3      A. He said he could take care of it.

4      Q. We are going to move now to Exhibit 23.  Do you recognize

5    Exhibit 23?

6      A. Yeah.

7      Q. What is Exhibit 23?

8      A. It's another screenshot of my phone with communications

9    with the defendant.

10     Q. Is it a continuation of the same text message chain

11   between the two of you?

12     A. Yes.

13     Q. And generally speaking, what were you communicating to

14   him here?

15     A. Basically told him I was leaving Sacramento in

16   30 minutes.

17     Q. And then at a later time, was he asking about your

18   status?

19     A. Correct.

20     Q. Let's move now to Exhibit 24.  Do you recognize

21   Exhibit 24?

22     A. Yes.

23     Q. What is Exhibit 24?

24     A. It's another screenshot of my phone with text messages

25   between myself and the defendant.

CI-489 - DIRECT

1    Q. Now, what are you communicating about with him at this

2    point?

3    A. So at this time, he text me back saying that there was

4    some changes on where we were going to meet up at.  He was

5    telling me that he had to go to Moreno Valley.  He wanted me

6    to see if I could go through Moreno Valley.

7    Q. And did you basically say no, that you couldn't make it

8    there?

9    A. Correct.

10   Q. And in -- that's in summary and conclusion; is that

11   right?

12   A. Yes.  At this point in time, these text messages, I was

13   already -- the defendant thought I was still on the road

14   driving.  I was actually already at a meet spot with the

15   detectives, and we were trying to set up the final location

16   for this deal.

17   Q. And you can't read the defendant's mind, obviously, but

18   you had told him in these text messages chain that you were

19   traveling from a location in Northern California to Southern

20   California --

21   A. Correct.

22   Q. -- right?

23        Let's move on to Exhibit 25.  And do you recognize

24   Exhibit 25?

25   A. Yes, sir.

CI-489 - DIRECT

1    Q. What happened in this exhibit?

2    A. Um, basically I told him I couldn't -- that I had to get

3    to Blyth and that there was some traffic problems on the

4    road.  So we just -- him and I were going back and forth on

5    trying to set up a meet spot where we were going to meet at.

6    Q. Basically, he was looking for you guys to meet closer to

7    Moreno Valley, and you were basically telling him that you

8    couldn't or wouldn't meet there; is that right?

9    A. Correct.

10   Q. So then in this exhibit did he suggest that you meet in

11   or around --

12   A. I didn't hear you.

13   Q. In this exhibit did he suggest that you meet in or around

14   Banning?

15   A. That is correct.

16   Q. Because he said he was in Banning?

17   A. Yes.

18   Q. And then did you ask him what he had for you?

19   A. Yes.

20   Q. And what did you mean by that?

21   A. I was basically asking what I was purchasing.  I didn't

22   know -- at that point in time, I didn't know if he only had

23   methamphetamines or if he just had firearms or he had both.

24   Q. And how did he respond?

25   A. He responded by both.

CI-489 - DIRECT

1    Q. And did you send him some kind of symbol?

2    A. I sent him a dollar symbol, that basically asking him how

3    much.

4    Q. Let's move on to Exhibit 26, please.  Do you recognize

5    Exhibit 26?

6    A. Yes.

7    Q. And in this exhibit did Defendant Gomez respond to your

8    question about how much?

9    A. Yes.

10   Q. And how did he respond?

11   A. He responded 500 for the toy and 1600 for the half.

12   Q. And what is the toy?

13   A. A toy is a firearm.

14   Q. And what is a half?

15   A. It was a half pound of methamphetamine.

16   Q. Did you and Defendant Gomez also communicate about where

17   to meet?

18   A. Yes.

19   Q. And where did you discuss meeting in this exhibit?

20   A. We were going to meet at the Whitewater exit right off of

21   I-10.

22   Q. Can we move to the next Exhibit 27, please.  Do you

23   recognize Exhibit 27?

24   A. Yes, it's another screenshot of my phone with text

25   messages from myself and the defendant.

CI-489 - DIRECT

1    Q. And in this exhibit, did you say that you tried calling

2    him but you weren't able to get ahold of him?

3    A. Yes.

4    Q. And did he respond to you?

5    A. Yes, he did.

6    Q. And how did he respond to you?

7    A. Told me he was going to -- he sent me a text saying, I've

8    got another number for you.

9    Q. Let's move on to Exhibit 28, please.  Do you recognize

10   Exhibit 28?

11   A. Yes.  Another screenshot of my phone.

12   Q. And did he provide you with additional information about

13   that other phone number in this exhibit?

14   A. In this exhibit, he just said he was going to -- he said

15   save that number.

16   Q. Did he tell you why you should save that number?

17   A. No, he didn't give me an explanation why.

18   Q. Did he say, This one will go off?

19   A. Oh, excuse me.  Yes.

20   Q. And did you understand by his phrase there that he would

21   stop using that phone number that he had been using to text

22   you?

23   A. Correct.

24   Q. Can we move on to Exhibit 29, please?  Do you recognize

25   Exhibit 29?

CI-489 - DIRECT

1      A. Yes.

2      Q. What is Exhibit 29?

3      A. It's another screenshot of my phone with the text message

4      on it from the defendant.

5      Q. This is a different phone number than we saw in the

6      upper, left-hand corner of the previous exhibits; is that

7      right?

8      A. Correct.

9      Q. And what's the message in this text message?

10     A. "Call me here.  It's Stranger's friend."

11     Q. And you understood that to be from Defendant Gomez; is

12     that right?

13     A. Correct.

14     Q. Now --

15          MR. PETERSON: Your Honor, the government moves to

16     admit Exhibits 22 through 29.

17          THE COURT:  Any objection?

18          MR. KALOYANIDES: No objection.  Thank you, Your

19     Honor.

20          THE COURT:  They will be received.

21          (Thereupon, Exhibit Numbers 22-29 were received in

22     evidence.)

23     Q. Now, I believe you mentioned earlier that you also spoke

24     with Defendant Gomez three times on the phone on or -- prior

25     to this second transaction with him; is that correct?

CI-489 - DIRECT

1    A. Correct.

2         MR. PETERSON: I would like to ask Ms. English for

3    her assistance, please.

4    Q. And can you look at what's been marked for identification

5    purposes only as Government Exhibit 3.  And if it's more

6    convenient, we are going to go with 4, 5 and 6 next.  Do you

7    recognize Exhibit 3?

8    A. Yes.

9    Q. What is it?

10   A. It's a disk.

11   Q. And do you understand that there is a recording on that

12   disk?

13   A. Yes.

14   Q. Do you understand that the recording is of a phone call

15   that you had with Defendant Gomez prior to the meeting?

16   A. Yes.

17   Q. And how do you know that?

18   A. I've reviewed it, listened to it.

19   Q. And do you understand that there is also a copy of that

20   same recording on the government's laptop here in the

21   courtroom today?

22   A. Yes.

23   Q. We are now going to move ahead with publishing Exhibit 3.

24         (Thereupon, the audio was played.)

25   Q. Now, in that recording, were you discussing with

CI-489 - DIRECT

1    Defendant Gomez where to meet?

2     A. Correct.

3     Q. And at a certain point in time, did he say something to

4    you to the effect of, "So you have that on hand as well"?

5     A. Yes, he did.

6     Q. And did you respond, "I got the paper with me"?

7     A. Yes.

8     Q. What -- what did you understand by your exchange with him

9    there?

10     A. He -- he basically asked me if I had the money on me or

11    if I had to go somewhere to pick it up, and I told him I had

12    it on me.

13     Q. Now, could you also look at what's been marked for

14    identification purposes only as Government Exhibit 4.  Do you

15    recognize that?

16     A. Yes, sir.

17     Q. And what is it?

18     A. It's another disk.

19     Q. And do you know what is on the disk?

20     A. Another recorded phone call.

21     Q. And how do you know that?

22     A. My initials are on the disk, and I made the phone call.

23     Q. And while we are at it, do you mind also taking a look at

24    Exhibits 5 and 6?

25     A. Okay.

CI-489 - DIRECT

1    Q. Do you understand that Exhibit 5 is also a disk

2    containing a recorded phone call?

3    A. Yes.

4    Q. And is that because you previously reviewed that disk?

5    A. Yes, sir.

6    Q. And do you see your signature on the disk?

7    A. Yes, I do.

8    Q. And can you look at Exhibit 6?

9    A. Go ahead.

10   Q. And you also recognize that exhibit?

11   A. Yes.

12   Q. And do you understand that that contains a recording of

13   the actual meeting that you had in person with Defendant

14   Gomez?

15   A. Yes.

16   Q. And is that because you previously reviewed the

17   recording?

18   A. Yes, sir.

19   Q. You see your initials on the disk as well?

20   A. Yes.

21   Q. Is it your understanding that all of those exhibits are

22   also on the government's laptop here in the courtroom, too?

23   A. Yes.

24   Q. Is that because you previously reviewed that as well?

25   A. Yes.

CI-489 - DIRECT

1    Q. So at this point we are going to move ahead and publish

2    Exhibit 4.

3              (Thereupon, the audio was played.)

4    Q. So in that phone call, did Defendant Gomez tell you, "I

5    got a whole one"?

6    A. Yes.

7    Q. What did you understand by that?

8    A. Basically, I was getting ready to purchase a half-pound

9    of methamphetamines, and so he was just offering me the whole

10   pound.

11   Q. And did you respond to him that you only had 25 on you?

12   A. Yes.

13   Q. And what did you mean by that?

14   A. That I had $2,500 on me.

15   Q. And why were you telling him exactly how much money you

16   had on you?

17   A. I don't want him to think that I had more, because it's

18   arranged in the premeet with the investigators on the

19   investigation that they are only going to give me so much

20   money to go in and purchase that, on what we ordered.

21   Q. In your experience, are drug transactions sometimes done

22   on a credit basis?

23   A. Correct.

24   Q. Were you in part trying to get a feeling for whether or

25   not Defendant Gomez would provide you with more

CI-489 - DIRECT

1     methamphetamine, in part based on a loan?

2      A. Yes.  I was trying to see if he would front me the other

3     half.  Basically see how much trust there was.

4      Q. You had an additional 400, right?

5      A. Right.

6      Q. But you didn't have what you understood to be the amount

7     that would cover the entire half?

8      A. Correct.

9      Q. And when -- and how did -- and did he respond to you by

10    saying, "I got somebody else right now that wants the other

11    half"?

12     A. Correct.

13     Q. And so what did you understand by that?

14     A. Basically, that he gave me the first -- the first shot or

15    first dibs at buying the whole pound, due to the fact that,

16    you know, in our world in selling drugs, and in my past

17    world, it's just easier.  Why make two trips when you can

18    make one trip and get the same amount of money?  You are just

19    making one trip to one person.

20     Q. You understood it would be more efficient?

21     A. Correct.

22     Q. Once you got to the Whitewater rest stop, did you call

23    Defendant Gomez?

24     A. Yes, I did.

25     Q. We are now going to move ahead and publish Exhibit 5.

CI-489 - DIRECT

1          (Thereupon, the audio was played.)

2     Q. And in that recording, did you essentially tell CI-5 that

3     you had arrived at the rest stop?

4     A. Yes.

5     Q. And did he tell you that he's on his way?

6     A. Yes, he did.

7     Q. Now, did Defendant Gomez actually meet you at the

8     Whitewater rest stop?

9     A. Yes, he did.

10    Q. How did he get there?

11    A. He was a passenger in another vehicle.

12    Q. Did you see that vehicle arrive?

13    A. Yes, I did.

14    Q. Was the parking area of the rest stop relatively empty?

15    A. Yes.

16    Q. And you saw the other vehicle drive up next to your

17    vehicle; is that right?

18    A. I think it was like two parking spots away.

19    Q. Did you see anybody else in that vehicle?

20    A. Yes, there was a female driving.

21    Q. When you say "female," like an adult or a child or --

22    A. It was an adult female.

23    Q. A woman in the car?

24    A. Yes.

25    Q. And did that vehicle park nearby your vehicle?

CI-489 - DIRECT

1     A. Yes.  Two parking spots away.

2     Q. And was your vehicle a truck?

3     A. Yes.

4     Q. What happened after the vehicle that Defendant Gomez

5     arrived in parked nearby your truck?

6     A. The defendant then entered my vehicle.  He sat down in

7     the front passenger's seat.

8     Q. And what happened after he entered your vehicle?

9     A. Um, said our hellos, had small talk.  And then he gave me

10    a half-pound of methamphetamine.  And we talked about the

11    firearm, and he said the firearm was in the back of the -- of

12    the car that he had just arrived in.  I told him, Don't worry

13    about it, don't -- I will pull my truck up to the -- to the

14    vehicle and he can just throw it in my truck.

15    Q. What was the purpose of moving your truck around?

16    A. Basically, that way no one would see what we were

17    trying -- what we were doing.

18    Q. Moving from the trunk of the car to the truck; is that

19    right?

20    A. Correct.

21    Q. Let's move ahead now with publishing Exhibit 6.

22        (Thereupon, the video was played.)

23    Q. Did you recognize Defendant Gomez's voice on the

24    beginning of that recording?

25    A. Yes.

CI-489 - DIRECT

1    Q. Did you refer to him having some jewelry?

2    A. Yes.

3    Q. What did you mean by that?

4    A. He had an ankle monitor on.

5    Q. Did you see that when he got into the vehicle?

6    A. Correct.

7    Q. And is it your understanding that the ankle monitor was

8    for tracking information?

9    A. I mean, I knew it was understanding that it was on there

10   for him to be located.  For what reason he got it put on, I

11   have no idea.

12   Q. Okay.  So then did he talk to you about, about what he

13   was doing because he had that on?

14   A. He said he was running around all over the place to keep

15   people off of his, you know, off his track.

16   Q. Can we proceed with the publishing?

17          (Thereupon, the video was played.)

18   Q. Now, at a certain time in that recording, did Defendant

19   Gomez say to you that he had a .22, then you said .38?

20   A. Yes.

21   Q. What did you understand by those references?

22   A. That he had another firearm and that he just got confused

23   on the caliber of which one he had found.

24   Q. Now, closer to the end, did you hear him say at one point

25   in time, did he refer to a "whole"?

CI-489 - DIRECT

1   A. Yes.

2   Q. And what did you understand that to be?

3   A. We are talking about pounds of methamphetamine.

4   Q. And did he -- did you ask him the price for that?

5   A. Yes.

6   Q. And what did he tell you?

7   A. He said three.

8   Q. And how much, is that actually like $3?

9   A. $3,000.

10  Q. That's what you understood by three flat?

11  A. Yes.

12  Q. Did that -- based on your experience, did that seem like

13  a reasonable price for that quantity of methamphetamine?

14  A. Yes.

15  Q. Now --

16      MR. PETERSON: Your Honor, I would like to approach

17  the witness with items of physical evidence.

18      THE COURT:  Let's take a break first, and we'll do

19  it after we get back.

20      All right.  Ladies and gentlemen, another

21  10 minutes.  Remember the admonition, please.

22      (Thereupon, the jury retired from the courtroom.)

23      (Thereupon, there was a brief recess.)

24              *****     *****     *****

25

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1          I certify that the foregoing is a correct transcript

2      from the record of proceedings in the above-titled matter.

3

4

5

6      --------------------------

7

8     Amy C. Diaz, RPR, CRR              June 6, 2016

9     S/  Amy Diaz

10

11     RYAN MONIS                                        7

12     DIRECT EXAMINATION                                7

13     BY MR. PETERSON

14     Exhibit Numbers 32 and 16                         46

15     CROSS-EXAMINATION                                 52

16     BY MR. KALOYANIDES

17     Exhibit Numbers 301, 302 and 305                  99

18     REDIRECT-EXAMINATION                              99

19     BY MR. PETERSON

20     RECROSS-EXAMINATION                              101

21     BY MR. KALOYANIDES

22     CI-489                                           103

23     DIRECT EXAMINATION                               103

24     BY MR. PETERSON

25     Exhibit Numbers 12-14 and 1-2                    138

1        Exhibit Numbers 22-29                                146
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25